**Lawrence H. SCHLANG and Olen Rae Goodwin, Plaintiffs,**

v.

**KEY AIRLINES, INC., a Delaware Corporation, Bain Investments, Inc., a Massachusetts Corporation, Presidential Airways, Inc., a Delaware Corporation, Coleman Andrews, James Bridges, William F. Swaim, Jr., Thomas Kolfenbach, Sean Deaton, Steven W. Wilson, Donald Kyker, Jointly and Severally, and Does I–X, Defendants.**

No. CV–S–86–838 RDF.

United States District Court,
D. Nevada.

July 24, 1992.

Jack E. Kennedy and Sherry Bowers, Reno, Nev., for plaintiffs.

Thomas P. Brown, Los Angeles, Cal., Michael L. Lowry, Atlanta, Ga., for defendants.

## DECISION

ROGER D. FOLEY, District Judge.

### INTRODUCTION

Lawrence H. Schlang and Olen Rae Goodwin ("Plaintiffs") initiated this action against (1) three corporations—Key Airlines, Bain Investments and Presidential Airways; (2) six individuals—Coleman Andrews, James Bridges, William Swaim, Jr., Thomas Kolfenbach, Sean Deaton, Steven Wilson, Donald Kyker. Plaintiffs alleged violations of (1) the Railway Labor Act ("RLA"), 45 U.S.C. §§ 155–188; (2) the False Claims Act; and (3) retaliatory discharge in violation of both the RLA and state public policy; (4) breach of Plaintiffs' express and implied contracts of employment; (5) breach of the implied covenant of good faith and fair dealing; and (6) breach of contract for failure to pay bonuses, incentives and profit-sharing. Additionally, Plaintiff SCHLANG alleged defamation. On March 13, 1987, this court granted motions to dismiss Defendants PRESIDENTIAL AIRWAYS and BAIN INVESTMENTS, INC. from this action. Additionally, this court granted Defendants' motion for summary judgment for alleged violations of the False Claims Act.

After transcripts of testimony and arguments of counsel were prepared and both parties' post-trial briefs were filed, the case was submitted to the Court for decision in September, 1991.

The following recitation provides a brief orientation to this case. Key Airlines ("Key"), is a supplemental air carrier as defined by the Federal Air Regulations ("FARs"). A supplemental carrier is essentially a contract charter service, and therefore does not sell tickets to the general public. Key first hired Plaintiff GOODWIN in 1983, and then furloughed him in 1984. He rejoined Key in October 1984, at a salary of $36,000 per annum, later raised to $37,000 per annum, and continued in Key's employ until March 5, 1986. Plaintiff SCHLANG joined Key in May 1985 and worked for Key until March 5, 1986. His salary was $35,000 per annum.

In the spring of 1985, Key considered a change in their pilots' compensation package. In addition to a new pay schedule, management considered a system of bonuses, incentives and profitsharing. Plaintiff GOODWIN learned of these proposed changes in a May 1985 pilots' meeting. Plaintiff SCHLANG heard similar representations in his May 1985 job interview. By September 1985, however, Key made it clear that the pilots would not receive any bonuses, incentives or profit shares.

Twenty-one (21) Key pilots sent a letter dated September 5, 1985 to Defendant BRIDGES, Key's chief executive officer, that stated that these pilots were forming a pilots' union "for the purposes of negotiating a contract covering the working conditions of all cockpit crewmembers." Plaintiff GOODWIN was the union's interim chairman, and Plaintiff SCHLANG was on the union's bargaining committee. Plaintiffs claim they formed this union to address Key's unsafe practices. Defendants contend that the pilots organized themselves because of their dissatisfaction with their admittedly low salaries.

Key Airlines, Inc. is a wholly owned subsidiary of WorldCorp., Inc. and does business in the State of Nevada and other states and, during the relevant time period in this action, was authorized by the Federal Aviation Administration to operate as a supplemental air carrier.

During Plaintiffs' employment at Key Airlines, the individual Defendants held the following positions at Key Airlines: Coleman Andrews was the Chairman of the Board of Directors, and was very active in the day-to-day affairs of Key and was also the Chief Executive Officer of Key's parent corporation, World Corp. James Bridges was the Chief Executive Officer. William Swaim was the Vice President and General Manager of Operations. Beginning in February, 1986, Thomas Kolfenbach was the Director of Operations. Sean Deaton was the Operations Control Center Manager. Steven W. Wilson was the Chief Pilot of Operations. Donald Kyker was the Flight Manager.

During Plaintiffs' employment at Key Airlines, Plaintiffs were not represented by a union.

On September 5, 1985, the first meeting of the Key Airlines Pilot Association (KAPA) took place and at that time Plaintiff Schlang was appointed Chairman of KAPA's Negotiating Committee and Plaintiff Goodwin was elected KAPA's interim Chairman. A written communication of such information from KAPA to Key Airlines was received by Key Airlines shortly thereafter.

On October 20, 1985, a petition was sent to the National Mediation Board ("NMB") requesting that KAPA be certified as the legal collective bargaining agent for Key Airlines pilots and its flight engineers as well.

During the time they were employed at Key Airlines, Plaintiffs reported to Key Airlines alleged violations of the Federal Aviation Regulations (FARs) by Key Airlines and by entering them in Key Airlines' flight log books.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Breach of Express or Implied Contract for Employment:*

(a.) Verbal Statements:

█ Pursuant to Nevada law, if a written contract does not exist, a presumption arises that employment is at will. *Brooks v. Hilton Casinos Inc.*, 959 F.2d 757, 759 (9th Cir.1992); *American Bank Stationery v. Farmer*, 106 Nev. 698, 701, 799 P.2d 1100 (1990); *Vancheri v. GNLV Corp.*, 105 Nev. 417, 420, 777 P.2d 366 (1989). Consequently, as long as an employer does not violate state public policy, an employer may terminate an at-will employee "whenever and for whatever cause...." *Smith v. Cladianos*, 104 Nev. 67, 68, 752 P.2d 233 (1988); *Vancheri*, 105 Nev. at 421, 777 P.2d 366; *K-Mart Corp. v. Ponsock*, 103 Nev. 39, 47, 732 P.2d 1364 (1987).

█ An employee may rebut the presumption that his employment is at-will if

he proves "by a preponderance of the evidence that there was an express or implied contract between his employer and himself that his employer would fire him only for cause." *Farmer*, 106 Nev. at 701, 799 P.2d 1100. To meet this burden, the employee must offer more than his subjective belief that he would be terminated only for just cause. *See Brooks* at 762 (Based on employees' testimony that they understood, assumed, or had the impression that satisfactory performance guaranteed their jobs, the court refused to find that the parties created anything other than an at-will contract stating, "a generalized understanding of job security based on satisfactory performance cannot create an implied contract of employment."); *Bally's Grand Employees' Federal Credit Union v. Wallen*, 105 Nev. 553, 556, 779 P.2d 956 (1989) (The court held that plaintiff's testimony that she "understood" that as long as she performed her duties she would retain her job "was insufficient as a matter of law to establish an intention on the part of [the employer] to create anything other than an at-will employment contract."); *Vancheri*, 105 Nev. at 421, 777 P.2d 366.

■ Plaintiff GOODWIN testified that neither Captain Johnston or Captain Heseltine notified him that he was an at-will employee, and that he assumed that once he was on the seniority list, as long as he "kept doing a reasonable job that [he] would maintain [his] job." Plaintiffs offered no evidence that any Key personnel ever told them that their reasonable performance guaranteed their job. Accordingly, Plaintiffs' testimony merely reflects their subjective belief and is legally insufficient to establish that they entered into anything other than an at-will employment contract.

### (b.) Written Statements

Plaintiffs contend that a memorandum from Defendant BRIDGES to all Key employees contained statements that rebut the at-will presumption. The disputed memo, entitled "KeyAir Basic Beliefs", states in pertinent part:

One of the key responsibilities of any leadership position is to establish a set of values and to guard those values against all compromises. Your executive management team has established such a set of values for KeyAir.

Over time, you will consistently hear us refer to KeyAir basic beliefs. They will become an integral part of all future management training and I have attached a copy for perusal....

[A]ll of our managers owe our employees certain basic dignities.... [N]o employee should be subjected to disciplinary action with no appeal process to higher levels of management if he or she feels that they have been treated fairly.

However, standardized disciplinary procedures alone cannot convert at-will employment into employment terminable for just cause only. *Brooks* at 760 (Disciplinary procedures are a generic feature of many employment relationships and therefore are insufficient as a matter of Nevada law to rebut the presumption of at-will employment.); *Vancheri*, 105 Nev. at 422, 777 P.2d 366 ("If we were to hold that the establishment of standard disciplinary procedures for employees is, in and of itself, sufficient to convert an at-will employee to an employee who can be fired only for cause, employers would be reluctant to continue to establish them."). Additionally, nothing in the above document alters Key's ability to terminate an employee at will. An employee may challenge a disciplinary action, but Key is under no obligation to alter its decision. *See Sands Regent v. Valgardson*, 105 Nev. 436, 439, 777 P.2d 898 (1989).

Neither Plaintiff had a written contract of employment with Key.

At no time, either prior to or during their employment at Key, was either Plaintiff told that satisfactory performance guaranteed him a job.

In a report dated March 18, 1985, Jim Bridges, who at that time was a consultant to Key, made several recommendations to Key concerning actions that should be taken to address specific problems. They included (1) acknowledging that problems exist; (2) reviewing the fuel bias issue; (3)

working on the seniority issue for upgrades; (4) working on an overall seniority system for all employees; (5) holding Captain's meetings once every two weeks; (6) holding regularly scheduled "communications" type meetings with small groups of employees; (7) designing and implementing a formal salary structure; and (8) reviewing the bonus package with employees.

Each of these problem areas was recognized by Key in March, 1985, well before any indications surfaced that its employees may be seeking union representation.

Bridges was hired as Key's Chief Executive Officer in May, 1985, and was assigned the responsibility for Key's overall management. Bridges immediately set out to resolve each of the problems reported in his March, 1985 Report.

In May, 1985, Bridges instituted programs whereby management met with employees individually and in groups to discuss employee concerns and possible solutions. These programs were instituted long before any union organizing campaign was begun.

As a result of these meetings, as well as Bridge's earlier findings, Key considered adopting a merit-pay program. Although some general proposals concerning the bonus and incentive programs were discussed with pilots in 1985, nothing was ever finalized and no promises were made.

The bonus programs were not implemented for a number of reasons, and the pilots were expressly informed of that decision.

Key was not profitable in 1985 or 1986, so there was no basis for a profit sharing payment in either year.

For these reasons, this court finds that the Defendant BRIDGES' memorandum did not alter Plaintiffs at-will employment status. Consequently, this court finds that Plaintiffs did not prove his claim of breach of an express or an implied contract.

*Violations of the Railway Labor Act:*

Plaintiffs allege violation of the RLA, 45 U.S.C. §§ 151–188. The statutory basis of Plaintiffs' argument provides in pertinent part:

Employees shall have the right to organize and bargain collectively through representatives of their own choosing.... No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them ... not to join or remain members of any labor organization....

45 U.S.C. § 152, Fourth (1991).

Plaintiffs contend that they "were discharged in retaliation for organizing a pilots union at Key Airlines to stop illegal and unsafe practices...." Defendants argue that "the terminations of Plaintiffs were motivated by legitimate business considerations and would have occurred irrespective of any union activity in which they may have engaged." Specifically, Defendants state, Plaintiffs were terminated because they had accepted employment with another air carrier.

■ Cases in which an employee contends that she would not have been terminated but for her union activity, and an employer contends that because of unsatisfactory job performance, the employer would have terminated the employee regardless of union activity, are called "mixed motive" cases. *See N.L.R.B. v. Wright Line*, 662 F.2d 899, 901 (1st Cir. 1981). In such cases, the employee must demonstrate that the employer's anti-union animus motivated the discharge. If the employee makes a *prima facie* showing, the employer must demonstrate that the termination would have occurred even in the absence of the employee's union activity. *Wright Line* at 902. Although *Wright Line* sets forth the test for mixed-motive cases under the National Labor Relations Act ("NLRA"), the case provides a valuable framework for an analysis of the RLA. However, this Court is mindful of the Supreme Court's warning that "the National Labor Relations Act cannot be imported wholesale into the railway labor arena.

Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). The Ninth Circuit adopted the *Wright Line* analysis in *N.L.R.B. v. Nevis Industries, Inc.*, 647 F.2d 905, 909 (9th Cir.1981).

■ When no direct evidence exists, a court must rely on circumstantial evidence to infer an anti-union motive. The inquires that guide a court's analysis are:

(1) the company's expressed hostility towards unionization combined with knowledge of the employee's union activities;

(2) the proximity in time between the employee's union activity and his discharge; and

(3) the disparate treatment of the discharged employees compared to other employees with similar work records or offenses.

*Grosschmidt v. Chautauqua Airlines, Inc.*, 40 Empl.Prac.Dec. 36,196, 107 Lab. Cas. 10,072, 122 L.R.R.M. 3254 (N.D.Ohio 1986).

In *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court addressed the tension between an employer's right to free speech and the NLRA's prohibition of interference with or coercion of employees in the exercise of their right to self-organize. The Court stated that any balancing between these two conflicting rights "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel Packing Co.* at 618, 89 S.Ct. at 1942. The Ninth Circuit defines "context" in terms of the employer's prior policies toward, and the history of, union or anti-union behavior before the union election. *N.L.R.B. v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1105 (9th Cir.1971); *N.L.R.B. v. General Telephone Directory*, 602 F.2d 912, 915 (9th Cir.1979). Consequently, the

Court held that an employer could express his general ideas about unionism, or his particular views on a specific union, "so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942 (citing to 29 U.S.C. § 158(c)). Additionally, an employer may predict the effects that unionization will have on the company as long as the predication is "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control...." *Id.* Ultimately,

[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Id.*

*Defendants' hostility toward unionization:*

■ Ample evidence of Defendants' hostility toward the union exists:

(a.) Literature:

In this case, Defendants' letters crossed the permissible boundary set forth in *Gissel Packing Co.*, and therefore are not protected by the First Amendment. Specifically, in the November 15, 1985, letter, Defendant BRIDGES, Key's chief executive officer, wrote that the union election was "vital ... to your job." Defendant BRIDGES opined that the election of a union would turn the employer-employee relationship into an "adversarial system." Furthermore, Defendant BRIDGES stated, all wages and benefits could be frozen "for an extremely long period of time" because direct negotiations often last more than a year, and after the parties deadlock, the parties must mediate their disputes, and after a second deadlock, the parties must arbitrate. And, noted Defendant

BRIDGES, while the union may strike, the airline is free to hire permanent strike replacements. Defendant BRIDGES closed his letter with a cautionary word: "[p]lease give this matter careful consideration as it may have a heavy impact on your future and the future of KeyAir."

In the December 4, 1985, correspondence, Defendant BRIDGES stated that, "[t]he law does not require that the airline agree to a single union demand. I think all of our pilots know that we would never agree to any union demand which we do not feel is in the best interest of our airline and its pilots." Again Defendant BRIDGES repeated his warning that all wages and benefits would most certainly be frozen for a long time, and that the introduction of a union created an adversarial atmosphere. Additionally, Defendant BRIDGES stated that "[a]ll changes to wages and benefits must be approved by the management team, and in some cases, by the Board of Directors. If such changes are not in the best interest of our employees, our shareholders, and our customers, then the management team would never concede to any union demand." Defendant BRIDGES repeated that a union could strike, but Key would be free to replace strikers with permanent replacements.

In the final letter, December 20, 1985, Defendant BRIDGES again underscored the possibility that wages and benefits would be frozen *"for months and maybe even for years"* (emphasis in original), and that a union creates an adversarial relationship between management and pilots.

This court finds that Defendant BRIDGES' emphasis on protracted and unproductive negotiations and the concomitant wage and benefit freeze establishes to this Court's satisfaction that Key would not agree to any union demand, and therefore the employees faced frozen wages and benefits, and ultimately possible job loss if the union called a strike. As such, the letters are not entitled to First Amendment protection, and represent a unfair labor practice or more. *See N.L.R.B. v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116

(9th Cir.1972); *N.L.R.B. v. Four Winds Industries, Inc.*, 530 F.2d 75 (9th Cir.1976).

### (b.) Meetings

■ The legality of an employer's interrogation of an employee's union views must be assessed in light of all the circumstances because not all employer questioning is coercive. *Hotel Employees & Restaurant Emp. Union v. N.L.R.B.*, 760 F.2d 1006 (9th Cir.1985). Appropriate circumstances to consider include: the company's labor relations history; the information sought; the rank of the questioner; the place and method of the questioning; and the truthfulness of the answer. *St. Agnes Medical Center v. N.L.R.B.*, 871 F.2d 137 (D.C.Cir.1989) (citing *Southwire Co. v. N.L.R.B.*, 820 F.2d 453, 456 (D.C.Cir.1987)).

Plaintiff GOODWIN testified that Defendant ANDREWS, Chairman of the Board of Key, requested a meeting with him in January 1986. Plaintiff GOODWIN stated that Defendant ANDREWS indicated that he knew that Plaintiff GOODWIN headed the union, and questioned why Plaintiff GOODWIN was so committed to the establishment of a union "since obviously there could be no future for [Plaintiff GOODWIN] at Key Airlines." Additionally, Plaintiff GOODWIN testified, Defendant ANDREWS compared the union to an unfaithful wife and stated that he would feel betrayed if the pilots voted for a union, and therefore Andrews would have to leave. According to Plaintiff GOODWIN, Defendant ANDREWS threatened to sell Key if the pilots voted for a union, and stated that the present Key management team would also leave. Finally, Plaintiff GOODWIN stated, Defendant ANDREWS indicated that if the pilots unionized, the company would be unable to attract customers, and would even lose some customers. Defendant ANDREWS testified that he met with Plaintiff GOODWIN, and that he never threatened him. However, Defendant ANDREWS never offered a different version of the meeting, nor did he contest the content of Plaintiff GOODWIN's testimony.

Defendant ANDREW's statements were coercive. Clearly, Defendant ANDREWS

used all the weapons in his arsenal. In his capacity as Chairman of the Board and as an active executive officer of the company, he summoned the union's leader for a private meeting. He threatened Plaintiff GOODWIN's job and he threatened to leave Key, and that the management team would also leave. He threatened to sell Key. Accordingly, the total circumstances reveal that this was improper interrogation, inspired by Andrews strong anti-union animus.

Additionally, some Key managers began to conduct one-on-one meetings with the pilots. Neither party cites the content of these meetings as supportive of their arguments. However, this court notes the timing of such meetings. Defendant BRIDGES testified that these meetings began in May 1985 and provided the pilots an opportunity to discuss their concerns with Key managers. However, Defendant SWAIM testified that these meetings began after the pilots indicated their intent to form their pilots' association. Plaintiffs also contend that Defendants intentionally scheduled pilots' meetings to interfere with union organizational meetings. Evidence supports this claim. The sum of this evidence indicates to this court that the content and timing of Defendants' meetings with pilots reflects Defendants' anti-union animus.

While Plaintiffs presented much more evidence of Defendants' actions, this court finds that the communications discussed above beyond doubt establish Plaintiffs' *prima facie* case. Therefore, the burden shifts to Defendants to demonstrate that they would have dismissed Plaintiffs regardless of their union activity.

Defendants contend that they would have severed their employment relationship with Plaintiffs regardless of their union involvement because Plaintiffs had accepted employment with Key's competitor.

*Violation of Nevada Public Policy:*

(a.) Key's Safety Program

In 1984, Key hired Thomas P. Balkenhol as Director of Technical Services to imple-ment an aggressive program to revamp completely its safety program.

Balkenhol recommended the adoption of a program similar to that utilized by TWA, one of the most demanding in the industry.

The safety program centered around the promulgation of, and strict adherence to, various FAA-approved maintenance manuals/programs: (1) A Time Limit Manual, (2) The Minimum Equipment List, (3) A Weight and Balance Program, and (4) The Reliability Program.

Each of Key's operations and training manuals were also specifically approved by the FAA. These include Key Airline's Flight Operation Training Manual.

Key's maintenance logs are subject to review by both the FAA and the Military Airlift Command ("MAC").

Key has never been cited by the FAA for violations of the FAR's maintenance regulations.

Key was always rated as a good carrier by MAC.

There have been occasions where mechanical problems noted by the crews have recurred after having been reviewed by Key's maintenance department. Because aircraft perform differently in the air than they do on the ground, a problem occurring in flight may not be able to be duplicated on the ground, and a few repair attempts are often necessary to fix a problem.

Key does not maintain a double set of maintenance records nor does it engage in "pencil-whipping" or any other unlawful practice.

Key has not experienced a single incident in which a passenger has been injured in its 27 years of operation.

Plaintiffs were both Key Captains and served as the Pilot–In–Command ("PIC") on every flight they operated. Key's Company Operations Manual provides several specific actions a PIC must follow before initiating a flight. The manual provides specifically that, *inter alia* the PIC will be responsible (1) for assuring that a preflight visual check is made of the aircraft before accepting it for flight; (2) checking that the correct amount of fuel is on board the

aircraft; (3) completing the Flight Record, including entering in the maintenance log each mechanical irregularity that comes to his attention during flight; (4) ascertaining before each flight the status of each irregularity entered in the log at the end of the preceding flight; (5) observing the requirements of all pertinent FAR's; (6) ensuring the safe conduct of the flight; and (7) delegating the proper duties to the First Officer and the Second Officer.

Key pilots are not to initiate flights unless they have satisfied themselves that FAA regulations are being followed and that the flight can be completed safely. Key pilots take maintenance delays without any discipline or other harassment from Key as a result.

Schlang and Goodwin, as pilots-in-command were to independently analyze all factors affecting a flight to conclude that the flight could be accomplished safely and in accordance with all operations specifications, FARs, and Company policies and procedures.

Both Schlang and Goodwin had the responsibility, as pilots-in-command to make certain that their aircraft were within weight and balance requirements approved and promulgated by the FAA and such determinations must be made prior to executing a flight release.

Neither Schlang nor Goodwin ever took off at any time without first assuring that aircraft were safe and that flights could be flown safely and in compliance with all Federal Aviation Regulations. As such, their log sheet reports contain no evidence of any unsafe or illegal practices by Key Airlines.

Plaintiffs could point to no instances in which they or any other pilots were harassed or otherwise disciplined for taking maintenance delays. Goodwin never initiated a flight without assuring himself that it was in full compliance with the FAA Regulations including the FAA-approved weight and balance procedures of Key.

Any problems of Jeppesen charts missing from the cockpit resulted from previous crews not putting the charts that they had used in the proper place at the conclusion of their flight, sometimes resulting in charts being thrown away by the maintenance crew cleaning the cockpit. The problem of missing charts was not Key's fault.

Key met all applicable FAA Regulations with regard to fueling. Pilots were free to put more fuel on board whenever they wanted and no one had ever suffered from any type of retaliation for it.

Key's management instructed pilots to follow the FAR's and told them that violations would not be tolerated.

Pilot complaints about hours of service and Key's interpretation of the FARs were commonplace and discussed often at pilot meetings.

When a pilot asked about interpretations of the duty time or the hours of service restrictions, Wilson investigated the matter by often asking the FAA for its interpretation, and he responded to the pilots with the information the FAA gave him.

Key relied on those FAA interpretations in preparing its schedules and never published a flight schedule violative of the FARs.

Key's interpretations of the FARs have been permitted by the FAA, the agency responsible for controlling and administering its own regulations.

The allegedly illegal flights flown by Schlang involved an unscheduled detour. Unscheduled detours have no effect whatsoever on the original schedule so as to render the flight illegal under the FARs.

Goodwin never discussed any of his supposed safety concerns with the Secretary of Transportation or the FAA.

No evidence was produced at trial to indicate that Schlang ever raised any safety complaints with the Secretary of Transportation or the FAA. In a letter protesting his termination Schlang did not even suggest that safety concerns had anything to do with the termination of his employment.

No management official at Key was ever told that Schlang or Goodwin had complained to the FAA about potential FAR violations.

(b.) Reporting Unsafe and Illegal Practices and The Law of the Case Issue:

■ Defendants argue that, pursuant to *Wiltsie v. Baby Grand Corp.*, 105 Nev. 291, 774 P.2d 432 (1989), Plaintiffs cannot recover on their retaliatory discharge claim because Plaintiffs did not report Defendants' alleged safety violations to the appropriate regulatory authorities.

Plaintiffs counter with two arguments. First, Plaintiffs contend that Defendants moved for summary judgment on this issue twice before, and twice this court denied Defendants' motion. Accordingly, Plaintiffs argue, the law of the case doctrine precludes reconsideration of *Wiltsie's* impact on Plaintiffs' claim.

In July 1987, prior to the *Wiltsie* decision, Defendants filed a Motion for Summary Judgment, and argued that federal aviation law pre-empted all state claims, including Plaintiffs' retaliatory discharge claim. In a September 1987 Order, this court denied Defendants' Motion. The court refused to reconsider its decision.

On December 28, 1989, seven months after the Nevada Supreme Court decided *Wiltsie*, Defendants filed a second Motion for Summary Judgment arguing that *Wiltsie* foreclosed Plaintiffs' claim. Plaintiffs responded with a Motion to Strike Defendants' Motion for Summary Judgment as to Plaintiffs' Third Claim for Relief, and in Opposition to Defendants' Motion for Summary Judgment as to Plaintiffs' Third Claim for Relief. In these two Motions, Plaintiffs raised some five defenses to Defendants' Motion including (1) Defendants' Motion violated this court's deadline for pre-trial motions; (2) Defendants' Motion merely reiterated their July 1987 arguments, and this court had already rejected Defendants' position; (3) *Wiltsie* was inapposite, and therefore could not provide the basis for a summary judgment motion; (4) Plaintiffs' third claim for relief was based on an alternative theory of wrongful termination for their refusal to participate in illegal activities, and *Wiltsie* did not address this aspect of Plaintiffs' claim; and (5) Plaintiffs made direct and indirect reports to appropriate officials and therefore fulfilled *Wiltsie's* reporting requirements. When the court denied Defendants' Motion for Summary Judgment, it did not reveal its reasoning.

The law of the case doctrine applies only if the court decided the disputed issue " 'explicitly or by necessary implication in [the] previous disposition.' " *Milgard Tempering, Inc., v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir.1990) (quoting *Liberty Mut. Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 441 (9th Cir.1982)). Given the number of varied defenses raised by Plaintiffs in their Motions and the brevity of the court's Order, it is impossible to know which defense, or combination of defenses, the court relied on to deny Defendants' Motion. Accordingly, this court rejects Plaintiffs' law of the case argument.

Plaintiffs argue that they complied with *Wiltsie* because (1) they reported alleged safety violations to the National Mediation Board ("NMB"); (2) they recorded safety violations in their aircraft log books as required by the FARs; and (3) they reported alleged violations to the Air Traffic Control ("ATC"). Plaintiffs' argument is without merit.

In *Wiltsie*, the Nevada Supreme Court held that firing an employee for reporting his employer's illegal activity violates the public policy of Nevada. *Wiltsie*, 105 Nev. at 293, 774 P.2d 432. However, to qualify for this limited public policy exception to the at-will employment doctrine, the *Wiltsie* court stated that the employee's actions must be for the public good, and not merely private or proprietary. Accordingly, the court held that the plaintiff did not state a cause of action for retaliatory discharge because he reported the illegal activity to his supervisor "rather than the appropriate authorities," and therefore, the plaintiff "was merely acting in a private or proprietary manner." *Id.*

■ Clearly, Plaintiffs' contention that they satisfied *Wiltsie's* reporting requirements when they notified the NMB about alleged safety violations is incorrect. As its name suggests, the NMB mediates disputes between employees and employers on issues such as rates of pay and working

conditions. Additionally, the NMB interprets agreements reached in mediation, investigates representation disputes, and certifies authorized representatives. *See* 29 U.S.C. §§ 152, Ninth, and 155 (1981). Nothing Plaintiffs presented to this court, or any information the court found, indicates that, by any stretch of the imagination, the NMB is the "appropriate authority" to report alleged safety violations. Indeed, Plaintiffs recognized the tenuous nature of their argument when they stated: "The NMB may not have been in charge of overseeing Key's compliance with aviation regulation, but it was a Federal body and might well communicate what was said, directly or indirectly, to the FAA." Clearly, *Wiltsie* requires direct notification of the appropriate authorities; communication with an agency that may or may not, directly or indirectly, notify the FAA cannot satisfy *Wiltsie's* reporting requirements.

■ Plaintiffs also contend that they reported safety violations to the Federal Aviation Administration ("FAA") through their log book entries because the log books were available for FAA inspection. Additionally, Plaintiffs argue, such log book entries satisfy *Wiltsie* because Key was also required to inspect the books and report any mechanical failure or malfunction to the FAA. (doc. no. 327 at 18). However, the argument that Plaintiffs' log book entries satisfy *Wiltsie's* "appropriate authority" standard is equally unpersuasive.

To the extent Plaintiffs argue that the log books satisfied *Wiltsie* because the entries notified Key about alleged safety violations and it was then Key's responsibility to contact the FAA, this court must disregard Plaintiffs' contention: *Wiltsie* clearly holds that a complaint registered with the employer is a private or proprietary action that is not entitled to public policy protection.

Alternatively, if Plaintiffs argue that the log book entries served as notification to the FAA, their contention is an impermissible extension of *Wiltsie.* The essence of the *Wiltsie* public policy exception is that the employee must take affirmative action and contact the appropriate authorities— must blow the whistle—to " 'expose illegal or unsafe practices.' " *Wiltsie* at 293, 774 P.2d 432 (quoting *Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250, 257 (1986)). Here, Plaintiffs did not contact anyone. They merely assert that the FAA *could have* inspected the log books, but they present no evidence that the FAA actually examined the entries. At trial, Plaintiff Goodwin testified that while each of his log book entries were available to the FAA, he never discussed any maintenance problems with the FAA; no one from the FAA inspected his log book entries while he was present; and he had no knowledge that anyone from the FAA inspected his entries at all. Indeed, aside from their assertion that it was Key's responsibility to notify the FAA, Plaintiffs offered no evidence that justified their belief that the FAA would see the entries. Specifically, Plaintiffs did not demonstrate how often the FAA inspected the books; under what circumstances it conducted investigations of log book entries; if the FAA inspected all entries or randomly selected entries; or when the FAA would discover the alleged violations. Consequently, Plaintiffs' behavior is hardly the type of affirmative whistleblowing activity that the *Wiltsie* court sought to protect. The FAA maintains an 800 number so that pilots may report FAR violation. Plaintiff SCHLANG testified that he called the FAA's 800 number and inquired "whether there was any immunity or any anonymity given to the pilot who reported any safety violation...." He learned that the FAA would grant neither immunity or anonymity. Consequently, Plaintiff SCHLANG did not report any of his safety concerns to the FAA through its 800 number. Such testimony makes clear that Plaintiff SCHLANG knew that there was a more direct, and efficient way to report violations. Accordingly, this court finds that Plaintiffs' log book entries do not satisfy *Wiltsie's* reporting requirements.

■ Plaintiff GOODWIN's testimony offers an illustration of the inadequacy of reporting events in log books. Specifically,

when questioned by Plaintiffs' counsel on "safety incidents", Plaintiff GOODWIN testified that a window cracked during a flight, and therefore posed significant risk to the passenger's safety. Plaintiff GOODWIN later stated that although this incident was not a safety violation, a similar subsequent event demonstrated Key's disregard for safety. Presumably, the second incident, in and of itself, also did not constitute a violation.

Although Plaintiff GOODWIN reported the first incident in the log book, he admitted on cross-examination that such an entry would not indicate any safety violation to the FAA. There is no evidence that Plaintiff GOODWIN logged the second cracked window in the log book. Additionally, there is no evidence that Plaintiff GOODWIN ever tried to communicate his belief that these two events demonstrated Key's disregard for safety to the FAA. Consequently, even if the FAA inspected the log books, nothing would alert them to possible safety violations. Consequently, this court cannot possibly construe Plaintiff GOODWIN's actions as a report to the appropriate authority.

Plaintiffs also argue that they reported the alleged violations to the FAA when they communicated with the ATC because ATC is an arm of the FAA. However, it is unnecessary to decide if ATC constitutes an appropriate authority pursuant to *Wiltsie* because this court finds that Plaintiffs did not communicate anything to ATC that entitles them to *Wiltsie's* protection.

The only testimony this court found that addresses Plaintiffs' communications with ATC is Plaintiff GOODWIN's testimony about two cracked plane windows. In the first incident, Plaintiff GOODWIN stated that during a flight, a passenger notified the flight crew of a large crack in a window. Consequently, Plaintiff GOODWIN notified ATC and requested "an immediate descent to a lower altitude" to lessen the pressure in the plane. The second incident occurred about a week later and involved the same plane. Plaintiff GOODWIN testified that after a flight, a mechanic informed Plaintiff GOODWIN that, during

the flight, one of the plane's engines had "ingested" a detached window. It is not clear if Plaintiff GOODWIN reported this to ATC.

Plaintiff GOODWIN also stated that a crack in a window sustained during flight did not constitute a FAR violation. Rather, Plaintiff GOODWIN explained, these two incidents demonstrated that Key "disregarded evidence on this aircraft that the windows had deteriorated in that that was not the only window that cracked...." Plaintiff GOODWIN stated that there were more than two windows that cracked. However, Plaintiff GOODWIN later admitted that he had no personal knowledge of any other windows cracking. This Court can find no testimony or other evidence that corroborated Plaintiff GOODWIN's assertion. Plaintiff GOODWIN apparently contends that the two cracked windows represented a pattern of unsafe practice, and supported an inference of Key's safety violations.

Assuming, *arguendo*, that Plaintiff GOODWIN's contention is correct, the evidence still does not entitle Plaintiffs to *Wiltsie's* protection: all the record supports is a finding that, during a flight, Plaintiff GOODWIN requested an immediate descent in altitude because a window cracked during flight. However, Plaintiff GOODWIN testified that this event did not constitute a violation. There is no evidence that Plaintiff GOODWIN ever notified ATC of his belief that Key disregarded evidence of a plane's deterioration. Consequently, there is no evidence that Plaintiff GOODWIN blew the whistle on Key. Accordingly, this court finds that Plaintiffs did not prove their claim of retaliatory discharge in this regard. In fact, Plaintiffs do not even allege that they anticipated ATC would notify the FAA's Investigation and Enforcement section, only that reports made to the ATC satisfied *Wiltsie*. Plaintiffs state: "There is no requirement that Plaintiffs report safety defects to some other branch of the FAA, or to some higher authority than the ATC...." (Id.). Plaintiffs may correctly assert that no regulation or statute required them to report to another branch. However, *Wiltsie's* dual

emphasis on the public's protection and reporting to the appropriate authorities clearly mandates that a whistleblower must blow into the ear of the appropriate authority, and not merely whistle in the wind in the hope that someone, somewhere will somehow act.

### (c.) Illegal Practices:

■ As an alternative theory of recovery for their retaliatory discharge claim, Plaintiffs argue that they were terminated because they refused to participate in safety violations. Unfortunately, neither party chose to brief this issue. However, this court's study indicates that Plaintiffs' alternative theory is equally unpersuasive.

The Nevada Supreme Court has not addressed whether an employee's termination for failure to participate in his employer's illegal activities violates Nevada public policy. However, for the purposes of this analysis, this court assumes that, if confronted with such a case, the Supreme Court would again follow *Wagner's* lead and find a violation of state public policy.

In *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250 (1986), the court analyzed the recourse available to an employee who refused to participate in illegal activity and stated, "an employee should not be faced with the dilemma of violating the law or losing his job." *Wagner*, 722 P.2d at 256. Central to both the court's reasoning and Plaintiffs' contention, is that the employee must recognize his dilemma: either he participates in illegal activity, or he suffers the adverse employment results. Additionally, it is implicit that an employee is protected by this public policy exception only if he decides not to participate in the illegal activity. Finally, if the employee follows his employer's instructions, and only later determines that such activity was illegal, the employee cannot receive the protection of this public policy exception. An employee in this situation is not without recourse. Specifically, when the employee discovers the activity's illegal or unsafe nature the employee could report to the appropriate authorities. If the employer terminates the employee for such reporting, the employee is entitled to whistleblower protection. *See Wiltsie*, 105 Nev. at 292, 774 P.2d 432 (1989). As such, in a retaliatory discharge analysis, this court must focus on the employee's knowledge and his choices.

Plaintiff GOODWIN testified that (1) he never initiated a flight without assuring himself that he was in full compliance with the FARs; (2) he never informed the crew scheduler of a problem in his schedule; (3) he never contacted the FAA to determine the meaning of a disputed section of the FARs; (4) during the discovery phase of this litigation, Plaintiff GOODWIN thought he "found a couple of log sheets with my flights that were questionable"; (5) he complied with Key's FAA-approved weight and balance system. He also testified that some of his flights between the East Coast and the Bahamas *may have* violated the FARs, and he would defer to Plaintiffs' expert to determine the existence of a violation. (Plaintiffs' expert did not testify about these flights.).

Nothing in Plaintiff GOODWIN's testimony demonstrates that he ever faced a choice between participation in illegal activity or the loss of his job. Although Plaintiff GOODWIN testified about violations involving other pilots, such testimony is irrelevant for the present inquiry. Accordingly, Plaintiff GOODWIN did not meet his burden of proof for retaliatory discharge.

Plaintiff SCHLANG testified that he "was not aware of a number of the safety and/or FAR violations until discovery was completed; in fact, in some cases, just right before the trial...."

This evidence clearly indicates that, for these particular situations, Plaintiff SCHLANG was unaware of his participation in safety violations. Therefore, he never had to chose between participation and his job. Accordingly, this evidence does not support his claim for retaliatory discharge.

Plaintiff SCHLANG also testified that his first flight with Key violated the FARs because the requisite navigational charts were not on board the aircraft. However, in his deposition testimony, Plaintiff SCHLANG stated that prior to departure,

he determined he could satisfactorily complete the flight without the charts. Apparently, Plaintiff SCHLANG did not notify anyone about the missing charts until some time later. Consequently, Plaintiff SCHLANG cannot now claim that he faced the dilemma of participation in illegal activity or his job. If Plaintiff SCHLANG initiated this flight, and it was in violation of the FARs, the responsibility was his alone.

Plaintiff SCHLANG also testified that he discovered a radar stabilization problem when he encountered inclement weather. Plaintiff SCHLANG stated that prior to encountering the bad weather, he was unaware of any radar problems because the log book pages were missing. Even assuming that Key violated the FARs because the log book pages were not on the plane, it is clear that when Plaintiff SCHLANG initiated the flight, he was unaware that the necessary pages were missing. Therefore, he never faced a decision to illegally initiate his flight, or keep his job.

Plaintiff SCHLANG testified about two incidents that appear to support his claim of retaliatory discharge. Specifically, Plaintiff SCHLANG testified about a February 13, 1986, flight that he contended was illegal because the schedule did not allow the required rest time. Plaintiff SCHLANG refused to fly the allegedly illegal portion of the schedule, and had Key management informed of his decision. Plaintiff SCHLANG perceived that Key personnel was upset with his refusal. However, Plaintiff SCHLANG did not testify that Key threatened him with the loss of his job unless he flew as scheduled.

Additionally, Plaintiff SCHLANG testified about a fall 1985 flight that he initiated with an inoperative radar. Such action does not violate the FARs if the weather is clear from the initiation point to the destination. Although Key dispatch assured Plaintiff SCHLANG that the weather was clear, Plaintiff SCHLANG encountered inclement weather, and required the aid of ATC to navigate. When Plaintiff SCHLANG landed, he notified Key dispatch of the circumstances, and threatened

that if a similar situation developed on the next leg of his schedule, he would leave the plane "and they could pick it up themselves." Plaintiff SCHLANG contends that Key lied to him about the weather, and only after a "rather heated conversation," Key issued him a new flight plan. (Id.). Plaintiff SCHLANG did not state that Key threatened him with the loss of his job. Clearly, only the events prior to the second leg of the trip are evidence of retaliatory discharge because Plaintiff SCHLANG was unaware of any illegality (if indeed Key did misrepresent weather conditions) during the first leg of the flight.

While this evidence provides support for Plaintiff SCHLANG's claim, this court finds that it is not compelling enough to support a finding that Defendants attempted to terminate Plaintiff SCHLANG for his refusal to participate in illegal activity. Plaintiff SCHLANG testified about numerous events including (1) Captain Wilson's threat that Plaintiff SCHLANG either deadhead back to Las Vegas, or pay his own way for New York to Las Vegas; (2) Key's refusal to allow Plaintiff SCHLANG, his crew and his passengers to go to a hotel when inclement weather cancelled their flight; Key's insistence that Plaintiff SCHLANG remove an imperative placard and continue his flight after mechanics repaired the antiskid system, but before mechanics performed functional tests on the system; a brake system failure. However, in his testimony, Plaintiff SCHLANG did not contend that Key's conduct was illegal. Accordingly, these events do not bear on the present analysis.

(d.) Unsafe Practices:

Plaintiffs contend that they were also terminated because they refused to participate in unsafe practices. Plaintiffs argue that, pursuant to *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394 (1984), this court should recognize that an employee's termination for her refusal to participate in unsafe, albeit legal practices, violates Nevada public policy.

The Nevada Supreme Court has not addressed the argument framed by Plaintiffs.

However, the Court did analyze a related issue, and held that an employer violates Nevada public policy if the employer discharges an employee who refuses to work under "conditions unreasonably dangerous to the employee." *D'Angelo v. Gardner,* 107 Nev. 704, 819 P.2d 206, 216 (1991). Citing to the Nevada Safety and Health Act ("NOSHA"), the Court stated that "the public policy of this state favors safe employment practices and the protection of the health and safety of workers on the job." *D'Angelo,* 819 P.2d at 216.

There is no need to address how, or even if, the NOSHA impacts the FARs because this court is unwilling to find that practices that are not violative of the FARs nevertheless create "conditions unreasonably dangerous to the employee." The Court is well aware of Plaintiffs' contention that the FARs only set safety minimums, and compliance with such minimums does not insure a safe operation. However, this Court is not willing to substitute its opinions for the expertise of the Secretary of Transportation; if Key's actions did not violate the FARs, this Court finds that Key's actions did not create unreasonably dangerous conditions. For example, in *D'Angelo,* the court stated, "tortious discharges may arise when an employer dismisses an employee in retaliation for the employee's doing of acts which are consistent with or supportive of sound public policy and the common good." *D'Angelo,* 819 P.2d at 216. Additionally, in *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025 (1985), the court held that an employee may refuse to participate in activities that contravene a law's important public policy interests even if the activity does not technically violate the law. *Wagenseller,* 710 P.2d at 1035. However, these case are easily distinguishable from the present case, and therefore inapplicable.

In *D'Angelo,* the Nevada Supreme Court interpreted Nevada legislation. Similarly, in *Wagenseller,* an Arizona court analyzed an Arizona criminal statute. These courts were well-suited to offer an authoritative interpretation of state legislation. The present case offers a sharp contrast: Plaintiffs ask this court—which has no expertise or experience in aviation safety—to find that activities that do not violate the regulations promulgated by the designated agency are nevertheless unsafe. However, this court is unwilling to second guess the FAA; if Defendants' conduct did not violate the FARs, this court is unwilling to find that such conduct was unsafe. This Court appreciates Plaintiffs' argument that the FARs represent the minimum safety standards, and as such, do not always guarantee safety. However, as this case readily demonstrates, the FARs are subject to a myriad of interpretation. Accordingly, aside from the FARs, this Court has no interpretive guideposts. Under these circumstances, sound judicial judgment demands that this Court defer to the FAA's expertise. Therefore, this court reject Plaintiffs' claim that they were attempted to be discharged in retaliation for their refusal to participate in unsafe practices.

*The Alleged Retaliatory Discharges*

 In 1986, Key was concerned with the potential problem of pilots resigning to join other airlines with little or not advance notice to management.

In February 1986, Royal West Airlines had announced its intention to commence passenger jet service out of Las Vegas and began actively recruiting pilots. Tom Kolfenbach, the Director of Operations at Key was concerned that Key would lose pilots to Royal West. Kolfenbach's previous employer had lost a number of pilots to United Airlines. Some of those pilots had given so little notice that planes were actually left stranded.

Kolfenbach called Royal West to determine whether any Key pilots were about to abandon their jobs for positions with Royal West and spoke to Marino Johannsson, Royal West's Vice President of Operations.

Johannsson told Kolfenbach that Royal West had hired several pilots but that he did not know who was coming from Key. Johannsson agreed to furnish Kolfenbach with the names of any Key pilots, and a meeting was arranged on March 4, 1986, with Johannsson, Kolfenbach and Swaim.

Johannsson showed Kolfenbach and Swaim a list of names and starting dates for pilots whom Royal West had hired. Three Key pilots, Schlang, Goodwin and Jim Holder, were listed as having been hired by Royal West, and they were scheduled to begin training toward the end of the month— approximately March 20, 1986. Johannsson specifically indicated that Schlang, Goodwin and Holder had been hired by Royal West.

Plaintiffs had acted on their own initiative and had applied for positions with Royal West.

Following that meeting, Kolfenbach and Swaim returned to Key, learned that Schlang's roommate, Holder, had quit without notice and determined that a meeting would be held with Schlang and Goodwin to find out whether they intended to stay at Key or go to Royal West.

Prior to meeting with Schlang and Goodwin, no final decision had been made with regard to their status with Key. However, Johannsson had indicated that Schlang and Goodwin would be starting with Royal West on March 20, about two weeks later. As of March 5, Key had received no information from Schlang or Goodwin concerning whether they were joining Royal West in *two* weeks or indicating that they were even considering leaving at all. Key had to be able to depend on the integrity of its schedules and needed to know their intentions. Management would have to rearrange the schedules of other pilots in order to cover the trips that Schlang and Goodwin were supposed to fly, just as it was having to do with Holder's scheduled trips. The airline also did not want to take the chance of having planes stranded.

On March 5, 1986, Kolfenbach and Wilson met with Schlang and Goodwin separately. Each of them were told that Key was aware that he had been hired by Royal West and that Key wanted to know what his intentions were. In the event he was going to Royal West, Key was requesting his resignation and would pay him an appropriate amount of severance.

Plaintiffs' actions support Key's belief that they were planning to quit. Schlang refused to confirm or deny that he planned to leave. Instead, he was merely surprised to be given any severance at all. When questioned regarding his intentions, Goodwin also failed to indicate that he was staying and merely stated that he was the only one who was going to give notice. This implies that Schlang, as his roommate Holder had done, was not going to give notice.

On March 5, 1986 Schlang signed a document indicating that he was resigning from Key and received severance pay. At that time, Schlang was provided with $2,019.45 for *fifteen days* of notice pay. The "fifteen days" represents fifteen working days, not calendar days as asserted by Plaintiffs. This reflects his true annual salary as $35,000 per year.

Goodwin declined to sign the letter of resignation, which was presented to him at the March 5 meeting. However, Goodwin accepted payment in the amount of $2,134.35 for *fifteen days* of notice pay. The "fifteen days" represents fifteen working days, not calendar days as asserted by Plaintiffs. This reflects his true annual salary as $37,000 per year.

Plaintiffs fully intended to start with Royal West at the end of March 1986. Formal offers had been extended to and accepted by Plaintiffs. After his meeting with Kolfenbach and Wilson on March 5, 1986, Goodwin *immediately* called Royal West to see if he could get into the training class that had already started, instead of the one in two weeks which he was scheduled for. Indeed, as of March 5, 1986, Schlang had already taken Royal West's physical and psychological examinations. The tests being taken by Schlang were tests which Royal West required after a job has been accepted.

In letters dated February 26, 1986 addressed to Schlang and Goodwin, Ron Burkevich, Royal West's Chief Pilot, "officially" notified them of Royal West's decision to employ them. Both Royal West and Plaintiffs understood even before the letter was received that they would be starting at the end of March, 1986.

Schlang and Goodwin did go to work for Royal West after leaving Key, earning $41,000 per year.

Later, Goodwin was discharged by Royal West. Key had nothing to do with Goodwin's dismissal.

Schlang too was discharged by Royal West. Key had nothing to do with Schlang's discharge by Royal West.

At the time of this trial, Goodwin was employed as a pilot for Connie Kalitta, at a salary of $55,000 per year. On January 19, 1987, Schlang suffered disabling injuries in an automobile accident. As such, Schlang is no longer certified to fly as a commercial pilot.

Had Plaintiffs not, before March 5, 1986, agreed to be employed as pilots for Royal West Airlines, Key would have discharged Plaintiffs on or about that date in retaliation for their activities as leaders of the union movement among Key's cockpit crew member employees. Because Plaintiffs had agreed to be employed with Royal West Airlines, before Key attempted to fire them on or about March 5, 1986, Plaintiffs cannot be awarded any compensatory damages for retaliatory discharge for their union activities.

*Breach of Covenant of Good Faith and Fair Dealing:*

 Plaintiffs contend that their employment relationship with Key contained an implicit covenant of good faith and fair dealing that Key breached when Key terminated Plaintiffs. In *K Mart Corp. v. Ponsock*, 103 Nev. 39, 732 P.2d 1364 (1987), the Nevada Supreme Court recognized the tort of bad faith discharge when the employer breached the covenant of good faith and fair dealing. However, a discharged employee may bring a bad faith discharge claim only when the employee has established both a contractual right to continued employment, and developed "a relationship of trust, reliance and dependency with the employer." *D'Angelo*, 819 P.2d at 211. Therefore, an at-will employee cannot assert a bad faith discharge claim. *Id.* Based on this rule and the previous discussion, this court finds that Plaintiff GOODWIN cannot recover under this claim. *See*

*Bally's Grand Employees Federal Credit Union v. Wallen*, 105 Nev. 553, 555, 779 P.2d 956 (1989); *Sands Regent v. Valgardson*, 105 Nev. 436, 439, 777 P.2d 898 (1989).

 However, even if a discharged employee rebuts the at-will presumption, Nevada law does not automatically allow recovery in tort for a breach of the covenant of good faith and fair dealing. *K Mart*, 103 Nev. at 48–49, 732 P.2d 1364. As announced in *K Mart*, "[t]he kind of breach of duty that brings into play the bad faith tort arises only when there are special relationships between the tort-victim and the tort-feasor...." *K Mart* at 49, 732 P.2d 1364. Accordingly, a court confronted with an employee's breach of the covenant of good faith and fair dealing claim must ask whether (1) a power differential creates a special element of reliance; (2) contract damages hold an employer accountable for their misconduct; and (3) contract damages make the discharged employee whole. *K Mart* at 49–50, 732 P.2d 1364. Plaintiffs failed to address these issues stating that "proof [of Defendants' breach of Plaintiffs' employment contracts in violation of the RLA and state public policy] preserves Plaintiffs' claims for breach of the covenant of good faith and fair dealing...." *See K Mart* at 51–52, 732 P.2d 1364. Accordingly, this court finds that Plaintiffs failed to prove by a preponderance of the evidence that Defendants breached their covenant of good faith and fair dealing when they attempted to discharge Plaintiffs. *See Beales v. Hillhaven, Inc.*, 108 Nev. 96, 825 P.2d 212, 215 (1992). The court rejected plaintiff's argument that her employment contract allowed discharge only for unethical or dishonest conduct, and therefore her discharge for "poor performance" created a bad faith tort. The court explained that "we have previously restricted the bad faith discharge tort to those 'rare and exceptional cases that the duty is of such a nature as to give rise to tort liability.'" The court concluded that the facts of the case did not meet this standard.

*Breach of Contract for Failure to Pay Bonuses, Incentives and Profit–Sharing:*

■ Plaintiffs claim that Defendants promised additional compensation in the form of bonuses, incentives, and profit-sharing, and then failed to honor their promise. Defendants state that Key management discussed proposed bonus, incentive, and profit-sharing plans with employees. However, Defendants claim, and this Court agrees, that such discussions were merely preliminary and did not provide the requisite degree of certainty or finality. Additionally, Defendants argue, and this Court agrees, that Plaintiffs did not present any evidence of a mutually agreed upon methodology to determine the amount due under the proposed bonus, incentive, or profit-sharing plans. Therefore, binding contracts do not exist.

### Defamation Claims

Schlang's defamation claim regarding the Domino's Pizza incident has been dropped.

Plaintiffs have produced no other evidence to support a defamation claim by a preponderance of the evidence.

### PUNITIVE DAMAGES

The anti-union activities of Key and Key's Management activities in violation of the Railway Labor Act shown by the evidence in this case cry out for remedy. The anti-union activities in this case are not merely unfair labor practices as Key argues, but blatant, grievous, wilful, deliberate and repeated violations of the Railway Labor Act. Key's violation of the Railway Labor Act have been proven by clear and convincing evidence, Key acting through Coleman Andrews, James Bridges, William Swaim, Thomas Kolfenbach and Steven Wilson, maliciously, wilfully and deliberately attempted and intended to stamp out any cockpit crew members' union before it could come into being. Especially in the absence of compensatory damages, this Court must exercise its equitable powers to punish Key for anti-union conduct as shown aforesaid for its Railway Labor Act violations. The law must be vindicated!

As shown aforesaid, Defendants blatantly violated Plaintiffs' rights under the Railway Labor Act to freely form a union. They first threatened Plaintiffs ("you have no future with Key"), then raised their salaries to bribe them from voting for a union. Finally, they tried to terminate Plaintiffs who were leaders of the said union movement. Defendants held coercive meetings with Plaintiffs and the other pilots. The management threatened to resign. The Defendants threatened that Key would lose contracts if the union came in. They "promoted" flight engineers to pilots to change the engineers union vote. They told the pilots that salaries, bonuses and benefits could be frozen for years. All the other harassing and threatening acts the Court heard were clear violations of Plaintiffs' rights to form a union free from interference under the Railway Labor Act.

Punitive damages are available under the Railway Labor Act and, although the Federal Courts are split, decisions where facts are similar to those here have allowed punitive damage claims. In *Brown v. World Airways, Inc.*, 539 F.Supp. 179, 180 (S.D.N.Y.1982), where the Plaintiff alleged he was discharged in retaliation for his union organizing activities, the court denied a motion to strike the punitive damage claim, stating:

An exhaustive search of the legislative history of the R.L.A. reveals no discussion of available civil remedies ... However, the plaintiff has quite rightly pointed out that Congress may have recognized a strong public policy rationale supporting the availability of the full range of tort damages, including punitive damages, in a case such as the present one ... Limitation of recovery to backpay pittance,[1] therefore, might encourage such an employer to continue illegal discriminatory practices which impede efforts to unionize its employees. As the

---

**1.** It is noted Brown mentions "backpay pittance". Here Plaintiffs get no compensatory damages.

**1512**

plaintiff has asserted, to ensure compliance with the R.L.A., Congress may have sought to make deliberate violations expensive enough to the wrongdoer to deter future tortious conduct.

The Court emphasized that when someone is not represented by a union he lacks power to defend against an employer's abuses, a special reason for permitting punitive damages. In *Belton v. Air Atlanta, Inc.*, 647 F.Supp. 28 (N.D.Ga.1982), the court said the purpose of the Railway Labor Act would best be served by allowing punitive damages against an employer who illegally interferes with the right of its employees to organize. Under federal law, punitive damages serve to punish an employer and deter others from following his example.

Key's harassment and interference with its employees' right to organize did not stop with Plaintiffs and the pilots' union. It continued and punitive damages are an appropriate method of telling Key it must stop. The National Mediation Board reports on Key's interference with the pilots' union, and later the flight attendants union, show a pattern and practice at Key. The 1989 report said the flight attendants' complaints were:

> disturbingly similar to a prior Board action concerning [Key Airlines] involving charges of improper carrier interference. Just three years ago, ... the Board found that Key had violated the pilots and co-pilots and flight engineers' freedom of choice of a representative when, among other things, two individuals involved in union activities were summarily forced to resign and employees were polled on their support for the union.

U.S. District Judge Harold Greene said, in an Order denying Key's motion to void the flight attendants' union vote: "In light of Key's history of harassment of employees, its expressions of concern for the 'rights' of its flights attendants ring hollow ... [i]ts protests are undercut by its history of efforts to undermine fair and democratic elections." Plaintiffs assert Key should pay punitive damages for its continuous violations of the Railway Labor Act.

The Court also notes the incident when Capt. Schlang was ordered to stay in an unheated airport overnight, while another Key pilot was told to take his passengers and crew to a hotel. Another time, after a long international flight with no further duty scheduled, Schlang was ordered to return to Las Vegas on a deadhead flight or else find his own way home, rather than be allowed to go to an already rented hotel room and rest. In an apparently insignificant yet malicious incident of harassment, when Capt. Schlang and another pilot tried to arrange for the pilots to get business cards printed, Defendant Wilson threatened Schlang's job while merely asking the other pilot to stop. These willful malicious incidents culminated, but did not end, with the Plaintiffs alleged terminations, which were directed not only against them but against all the pilots, since fear of the same retaliation effectively dampened the union movement.

When punitive damages are assessed, the net worth of World Corp., (which has taken responsibility for Key's defense and legal fees) should be considered. Through a series of sales World Corp., of which corporation Coleman Andrews was Chief Executive Officer, syphoned off Key's assets. World Corp. is the parent of Key Airlines. Coleman Andrews was Key's Board Chairman and also very active in the management of Key's day-to-day affairs. Dr. Coleman, Plaintiff's expert economist, testified that a reasonable method of determining the value of World Corp. is to look at the market value of its shares, which according to its 1989 10–K form was then $71,539,604. According to the 10–Q form filed January, 1990, World Corp.'s composite assets which wholly owns Key, were $191,645,000, and Coleman Andrews testified the corporate revenue for 1990 was $225,000,000. Coleman Andrews' income exceeded $3.3 million and combined officer income approached $10 million annually.

Punitive damages particularly should be awarded to punish Defendants in the same malicious manner they would have punished Plaintiffs. Frustrated and outraged during an expert's deposition, Key's President Tom Kolfenbach, said Capt. Schlang

would have to "lose a little skin the game" and pay some of Defendants' legal fees "*when* Defendants won this case." He threatened to *attach* Capt. Schlang's *home, wages, everything when the case was won.* It is time the Defendants "lose a little skin" for their history of intimidation, threats and wrongful retaliatory terminations.

Malice, both actual and legal, is demonstrated by Defendants' actions. Punitive damages should ensure that the Defendants will never again harass, intimidate, threaten or discharge their employees because they assert their rights to form a union.

Considering all of the evidence in this case, this Court believes that it must impose a substantial punitive damage penalty against Key Airlines and its executive officers and in favor of Plaintiff in the sum of $500,000.00. Although this Court has considered the earnings of and the value of Key's parent, World Corp., Inc. in fixing the punitive damage award, it must be kept in mind that Key is just one of a number of subsidiary corporations of World Corp. This award is made against Key Airlines, Inc., Coleman Andrews, its Board Chairman, James Bridges, its Chief Executive Officer, William Swaim, its Vice President and General Manager of Operations, Thomas Kolfenbach, its Director of Operations and Steven Wilson, its Chief pilot, jointly and severally.