NORMA BEALES, Appellant/Cross-Respondent, *v.* HILLHAVEN, INC., Respondent/Cross-Appellant.

No. 20668

January 24, 1992                                   825 P.2d 212

*Perry & Spann,* Reno, for Appellant/Cross-Respondent.

*Vargas & Bartlett* and *Albert F. Pagni,* Reno; *Jackson, Lewis, Schnitzler & Krupman* and *Gary R. Kessler,* Atlanta, Georgia, for Respondent/Cross-Appellant.

## OPINION

By the Court, MOWBRAY, C. J.:

Norma Beales, sixty-two years old at the time of trial, was first hired at the Reno Convalescent Center (RCC) on April 27, 1971, as office manager. Beales was hired, pursuant to an employee handbook, as a permanent employee, subject to a ninety-day probationary period. With respect to this matter, RCC and respondent Hillhaven, Inc. are the same entity. To avoid confusion, "Hillhaven" will be used exclusively below.

On February 23, 1972, Beales became the acting administrator. After passing the state licensing examination, Beales became the actual full administrator of Hillhaven, in which position she remained until her termination of employment on June 16, 1986.

Alan Oppenheim became the district director of the Nevada District, and Beales' immediate supervisor, on January 15, 1986. Beales reported directly to Oppenheim and Oppenheim reported to Gary McGuire, the director of operations. Oppenheim testified that, when he first became district director, McGuire told him that Hillhaven was having problems with nursing hours per patient day and accounts receivable figures.

As the administrator of Hillhaven, Beales was responsible for keeping nursing hours per patient day under 2.75 hours and the aged accounts receivable to under five percent. On February 12, 1986, Oppenheim wrote Beales a memorandum critical of her handling of nursing hours per patient day and accounts receivable. On March 5, 1986, Oppenheim sent another critical memorandum to Beales regarding communication and management problems.

On April 14, 1986, Oppenheim wrote two memoranda to Beales placing her on probation and setting forth requirements as to accounts receivable and nursing hours per patient day. During this same time period, in mid-April and early May, Beales received letters from Ed Laskey (vice-president of operations), Oppenheim, and Neil Elliot (president, convalescent division) congratulating her for fifteen years of dedicated service. Elliot's letter stated that the residents are especially appreciative of her efforts because the continuity of a stable staff means so much to them. In the beginning of May, Beales attended the monthly meeting of administrators where she received a fifteen-year diamond pin and congratulations for her services as a long-standing and loyal employee.

On May 7, 1986, Oppenheim wrote Beales a memorandum stating that although nursing hours spent per patient day showed improvement, they remained short of the facility objective. The memorandum extended the probationary period through May 31, 1986.

Each fiscal year the administrator and Hillhaven's management would agree on performance objectives and state them in a Management Objective Form (MBO). Beales negotiated the yearly MBO with Oppenheim (for fiscal year 86/87—June 1, 1986, to May 31, 1987) and Oppenheim signed off on it on May 6, 1986. As to the accounts receivable, the MBO stated that Hillhaven would "attain 60 day receivable outstanding to $5,000.00 by 8/86 and maintain thereafter" at fiscal year 1985-86 levels. On May 27, 1986, Beales and Oppenheim renegotiated a new MBO forecast for 1986-87 in which the accounts receivable goal and the goal for nursing hours per patient day were lowered. Oppenheim testified at trial that the reason both the accounts receivable and nursing hours per patient day levels were lowered in the second MBO was that McGuire "felt that was totally unachieveable [sic] for the history of Reno and he increased that percentage to help the facility make it more realistic."

Mike Jacobs, the prior district director, testified that he considered the MBO a binding agreement between himself and the administrator, and that it was part of the employment contract. Jacobs further testified that, in his opinion, Beales followed established practice and procedure and was aware of her accounts receivable and made an effort to collect them. In apparent contradiction, Oppenheim testified that MBOs are not part of the contract for performance, but rather guidelines.

On June 16, 1986, Oppenheim told Beales that she was to be terminated. He told her that since she had been a good long-term employee, she could resign. Beales telephoned her attorney and

then turned in a written resignation. Subsequently, the jury would find that the resignation was involuntary and of no legal effect.

About three months after Beales left Hillhaven, she obtained a position as a nursing home administrator with ARA Convalescent in California for $36,000.00 per year. Beales left this job because the facility burned down. On December 1, 1987, Beales took a position at the Riverside Nursing Home (Riverside) in Reno. Beales had a written contract for $40,000.00 per year, which contained a provision for termination by either party with fifteen days notice. The owner of Riverside terminated the contract on January 29, 1988.

Approximately three months later, Beales went to work as an administrator of the Mission Terrace Nursing Home in Santa Barbara, California, at a salary of $50,000.00 per year. Soon thereafter, however, she left Mission Terrace. According to Beales, she left after witnessing numerous violations of patient and employee rights. Beales returned to Reno and sought employment in her field until the trial of this action in 1989. She was unable to find employment.

Eventually, Ms. Beales had her day in court. Both the facts recited above and substantial additional evidence were presented at trail. The jury concluded that Ms. Beales had been wronged and awarded her $32,821.42 in past damages and $208,476.00 in future damages. The future damage award was considerably less than the maximum figure of $315,791.00 calculated by Dr. Cargill, an expert witness for Beales.

Beales' contention on appeal is that the district court erred when it granted Hillhaven's NRCP 41(b) motion to dismiss her bad faith discharge tort. *See* Bates v. Cottonwood Cove Corp., 84 Nev. 388, 391, 441 P.2d 622, 624 (1968). Beales argues that her contract allowed discharge only for dishonest or unethical conduct, and that her discharge for "poor performance" gave rise to a bad faith tort.[1] *See* K Mart Corp. v. Ponsock, 103 Nev. 39, 49, 732 P.2d 1364, 1370 (1987).

Beales' argument lacks merit. We have previously restricted the bad faith discharge tort to those "rare and exceptional cases that the duty is of such a nature as to give rise to tort liability." *Id.* at 49, 732 P.2d at 1370. *See also* Western States Minerals v. Jones, 107 Nev. 116, 819 P.2d 206 (1991). We cannot conclude that the facts of the present case are so exceptional as to give rise to a bad faith discharge tort.

---

[1]Respondent's personnel manual contained no provision for discharge for job performance; it included only a provision for discharge for cause with cause being defined as dishonest or unethical behavior.

Hillhaven raises several issues by way of cross-appeal. Hillhaven's first contention is that the jury was inadequately instructed as to the duty to mitigate damages.

The usual damage formula in wrongful discharge cases is that "the employee is entitled to recover the present value of the difference, over the term of the contract, between the agreed-upon wages and the amount which the employee could have earned if he had, with reasonable diligence, searched for similar employment." 22 Am.Jur.2d *Damages* § 111 (1988). In the present case, the trial court offered the following instruction to the jury:

> The Plaintiff has a duty to mitigate her damages, that is an affirmative burden to act in a manner that minimizes her damages. This includes the seeking and acceptance of alternate employment for the period covered by the agreement.

Hillhaven contends that the above instruction was insufficient to properly instruct the jury regarding Beales' duty to maintain comparable subsequent employment.[2] We disagree. We conclude that the trial court's instruction adequately apprised the jury of Beales' duty to seek and maintain subsequent employment.

Hillhaven also contends that the district court erred in refusing to grant a new trial due to juror misconduct. Specifically, Hillhaven cites the presence of a text entitled *Fear of Firing* in the jury room. The text at issue was consulted solely by one juror whom the judge disqualified and dismissed from the case. The court determined that the remaining jurors were not prejudiced. We find no indication that the trial court abused its discretion in finding no prejudice; therefore, denial of the motion for new trial motion was proper. *See* Stackiewicz v. Nissan Motor Corp., 100 Nev. 443, 452, 686 P.2d 925, 931 (1984) (question of prejudice is a question of fact for the trial court and will not be disturbed on appeal absent an abuse of discretion).

Hillhaven claims that there was insufficient evidence presented at trial to support the award of future damages, and the dissent

---

[2]Respondent requested the following additional paragraph for clarification:

> This also includes an obligation to maintain subsequent employment. Thus, if you find that plaintiff either voluntarily quit suitable employment or was terminated for cause from her subsequent employment, the earnings she would have earned from those subsequent jobs had they continued should also be deducted from her claim for lost wages and benefits.

echoes this point. The jury was instructed that Beales had the obligation to mitigate her damages by seeking other employment. She testified she could not find employment in her field once she returned to Reno in 1988. Apparently, the jury believed her. Dr. Cargill, Beales' economist, made a series of projections concerning Beales' future economic loss which included two principal variables: the chances of her finding comparable work in the Reno area (with a pessimistic calculation of a twenty-five percent chance of finding employment and an optimistic one of seventy-five percent) and whether she would work to age sixty-five or seventy. The series of calculations ranged from a minimum wage loss of $49,152.00 to a maximum of $315,791.00. Therefore, once the jury found that she was entitled to future damages, it was entitled to weight the variables and award Beales the appropriate amount. Its verdict of $208,476.00 in future damages was well within the parameters set by Dr. Cargill.

Finally, Hillhaven contends that the evidence was insufficient to establish an employment contract that provided that she could only be fired for cause. According to the terms of Hillhaven's handbook, all employees are designated as permanent employees once they have successfully completed the probationary period. But designation of an employee as a "permanent employee" in and of itself and without further definition does not mean that the employee status has been changed from at will. "Permanent" could be used to distinguish from a temporary or probationary employee with no intent of either party to change the at will status of an employee. *See* Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233 (1988). Although the designation of an employee (i.e., temporary, probationary, permanent) should be considered as one fact in determining if the employee is something other than at will, this designation standing alone is insufficient to change the presumption of at will employment.

Likewise, Beales' subjective expectation of long-term employment does not alter her at will status. Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989). Evidence to establish an implied or express contract between employee and employer must be presented to support the assertion that an employee can only be fired for cause and to overcome the rebuttable presumption of at will employment.

Nevertheless, this case does contain sufficient evidence in Hillhaven's employee handbook and termination policy guidelines to support Beales' claim that she was a for cause employee. The termination policy describes three categories of termination:

resignation, termination for cause and layoffs. It further states that termination must be "carefully and professionally handled" and that "the days of termination 'at will' or 'at whim' are gone." The handbook set up a progressive discipline procedure consisting of warnings, probation, suspension and dismissal. Establishing such a discipline procedure, in and of itself, does not change the employee's status from at will to for cause. *Id.* at 422, 777 P.2d at 369. But when this written for cause discipline procedure is coupled with Hillhaven's termination policy and Beales' testimony, a jury could reasonably conclude that the entire dismissal procedure was referring to for cause employees, one of whom was Beales.

Having concluded that there was sufficient objective evidence upon which to base the jury's determination that Beales was a for cause employee, we must then determine if the contractual procedures afforded a for cause employee at Hillhaven were adhered to in this case.[3] Ample evidence was presented from which the jury could conclude that the termination procedure was not followed or that Beales was terminated for reasons other than those specifically stated. She was terminated less than three weeks after the MBO had been revised to reflect more realistic goals, and this short period provided insufficient time for either adequate performance feedback or improvement. Beales was fifty-nine years old at the time of her discharge. Because of her termination, Beales was forced to withdraw the deferred income from her retirement fund early and at a loss. She is consequently receiving less retirement now than she would have if she had remained an employee of Hillhaven until she was sixty-five years old. Furthermore, the salary of the employee hired to replace Beales was $30,000.00; Beales was receiving $36,729.00 when she was terminated, in addition to benefits for her disabled husband. Hillhaven saved a substantial amount of money by terminating Beales, and the jury could have reasonably concluded that this was the real reason behind termination.

All remaining contentions are meritless. Accordingly, we affirm the judgment of the district court.

SPRINGER and ROSE, JJ., concur.

YOUNG, J., with whom STEFFEN, J. joins, concurring in part and dissenting in part:

[3]Termination policy for performance-based termination requires: (1) providing adequate performance feedback to the employee; (2) insuring that the employee has had adequate training to succeed; and (3) allowing the employee sufficient time for improvement.

I concur generally with the court's conclusion that appellant's and cross-appellant's arguments on appeal are without merit. I dissent, however, from the majority's affirmance of the award of future damages.

The jury awarded appellant $208,476.00 in future damages. We have previously held that "an appellant court will disallow or reduce the award if its judicial conscience is shocked; otherwise it will not." Miller v. Schnitzer, 78 Nev. 301, 309, 371 P.2d 824, 829 (1962). I am troubled by the award of future damages in this case and particularly in view of the assertion by respondent that appellant had begun working for a nursing home shortly after trial.

After leaving her position at Hillhaven, appellant had three jobs in the span of approximately two and one-half years. The first position paid a salary comparable to what she was earning at Hillhaven. Her next position paid approximately $3,000.00 per year more than her salary at Hillhaven. Appellant's third position paid $50,000.00 per year—an annual increase of more than $13,000.00 above her salary at Hillhaven. These facts alone suggest that appellant was indeed capable of finding employment after her termination from Hillhaven. Appellant's own expert witness testified at trial that, if appellant had been employed at the time of trial, the measure of future damages would be zero. To award her $208.476.00 in future damages, given these facts, seems to me to make Hillhaven the indefinite insurer of appellant's employment, even after the age of sixty-five when most employees retire.

Furthermore, after trial, Hillhaven moved to reopen discovery on the issue of future damages and alleged that appellant had begun working for a nursing home "almost immediately after trial." In response, although appellant denied that she had begun working the week after trial, appellant did not deny that she had begun working.

Appellant was fifty-nine years old when she was terminated by Hillhaven and sixty-two years old at time of trial. She testified that nothing in her health would prevent her from working to or beyond the age of seventy. She received $32,821.42 for compensatory damages up to the time of trial. Presumably, the jury took into consideration the money earned by her during the two and one-half years after termination and before trial. Her annual salary when at Hillhaven was $36,729.00. The record does not reflect the net salary after taxes. It seems questionable to affirm a future damages award equivalent to almost six years of her gross salary at Hillhaven when appellant had obtained three comparable jobs after her Hillhaven employment ended and was employed again shortly after trial. Under the circumstances, I believe that

respondent should have been able to determine when appellant was employed and whether this employment was a reasonable prospect at the time of trial. I therefore dissent.