33 P.3d 518

**Linda TAYLOR, a married woman, Plaintiff/Appellant,**

v.

**GRAHAM COUNTY CHAMBER OF COMMERCE, Defendant/Appellee.**

No. 2 CA–CV 01–0032.

Court of Appeals of Arizona, Division 2, Department A.

Oct. 18, 2001.

**186**

Salese & McCarthy, P.C., By Armand Salese and Ned Garn, Tucson, for Plaintiff/Appellant.

DeConcini, McDonald, Yetwin & Lacy, P.C., By Lisa Anne Smith, Tucson, for Defendant/Appellee.

## OPINION

PELANDER, Judge.

¶ 1 This employment termination case presents issues concerning the interplay between the Employment Protection Act (EPA), A.R.S. §§ 23–1501 through 23–1502, and the Arizona Civil Rights Act (ACRA), A.R.S. §§ 41–1401 through 41–1493.02. Plaintiff/appellant Linda Taylor appeals from the trial court's entry of summary judgment in favor of her former employer, defendant/appellee Graham County Chamber of Commerce (GCCC) on both her tort and contract claims. Because that ruling was consistent with and mandated by the EPA, we affirm.

## BACKGROUND

¶ 2 Viewed in the light most favorable to Taylor, *Johnson v. Hispanic Broadcasters of Tucson, Inc.*, 196 Ariz. 597, ¶ 2, 2 P.3d 687, ¶ 2 (App.2000), the facts pertinent to this appeal are as follows. GCCC is an Arizona non-profit corporation with fewer than fifteen employees. Sheldon Miller, GCCC's executive director, hired Taylor as an administrative assistant after approval of GCCC's board of directors. Taylor, a woman in her early fifties, worked for GCCC in that capacity from August 1998 to April 1999.

¶ 3 It is undisputed that Taylor performed well on the job initially and received a raise after successfully completing a ninety-day probationary period. During that time frame, Taylor received a handwritten note from Miller expressing his pleasure with her work and her presence in the office, and Miller treated her in a very professional manner. That changed, however, when Miller began hiring younger, attractive women in December 1998. From that point forward, Miller treated the younger women more favorably than Taylor, became increasingly rude to her and more critical of her work, reprimanded her, and prepared memoranda to document alleged deficiencies in Taylor's job performance.

¶ 4 Miller fired Taylor on April 9, 1999. Although Miller informally discussed his plan to terminate Taylor with a few GCCC board members, he did not seek formal board approval. After Taylor had been fired, the GCCC board voted to approve the termination, without giving Taylor an opportunity to speak to the board. Additional facts pertinent to the specific issues Taylor raises are discussed below.

¶ 5 In her complaint, Taylor alleged two claims, the first expressly based on the EPA: (1) a tort claim for discriminatory treatment and wrongful termination based on her age and gender, in violation of the public policy expressed in ACRA's anti-discrimination provision, A.R.S. § 41–1463(B)(1); and (2) a contract claim based on various provisions in GCCC's personnel manual which, Taylor alleged, constituted a "contract of employment" that GCCC breached when it terminated her. GCCC

moved for summary judgment on both claims, and the trial court ultimately granted that motion without comment. This appeal followed.

## DISCUSSION

### I.  Wrongful Termination Claim

¶ 6 Taylor first contends the trial court erred in granting summary judgment on her wrongful termination tort claim. We review de novo that ruling and related issues of statutory interpretation. *Johnson*, 196 Ariz. 597, ¶ 2, 2 P.3d 687, ¶ 2; *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 8, 965 P.2d 47, ¶ 8 (App.1998).

■ ¶ 7 Because GCCC had fewer than fifteen employees, Taylor has no actionable, direct claim under ACRA. *See* A.R.S. §§ 41–1461(1), (2), 41–1463(B)(1). Therefore, she bases her wrongful termination claim solely on the EPA and ACRA's public policy, which generally prohibits employers subject to ACRA from discharging or otherwise discriminating against individuals, inter alia, because of their sex or age. § 41–1463(B)(1); *see Spratt v. Northern Automotive Corp.*, 958 F.Supp. 456, 462 (D.Ariz.1996); *Hawkins v. State Dep't of Econ. Sec.*, 183 Ariz. 100, 104, 900 P.2d 1236, 1240 (App.1995). As pertinent to Taylor's wrongful termination claim, the EPA provides in part:

> 3.  An employee has a claim against an employer for termination of employment only if one or more of the following circumstances have occurred:
>
> . . . .
>
> (b) The employer has terminated the employment relationship of an employee in violation of a statute of this state. If the statute provides a remedy to an employee for a violation of the statute, the remedies provided to an employee for a violation of the statute are the exclusive remedies for the violation of the statute or the public policy set forth in or arising out of the statute, including the following:
>
> (i) The civil rights act [ACRA] prescribed in title 41, chapter 9.
>
> . . . .

All definitions and restrictions contained in the statute also apply to any civil action based on a violation of the public policy arising out of the statute. If the statute does not provide a remedy to an employee for the violation of the statute, the employee shall have the right to bring a tort claim for wrongful termination in violation of the public policy set forth in the statute.

A.R.S. § 23–1501(3)(b).

■ ¶ 8 Unlike ACRA, the EPA applies to all employers, not only those with fifteen or more employees, and addresses claims for "termination of employment" but not other wrongful employment acts or omissions. *Compare* § 23–1501(3) *with* § 41–1463(B). Taylor contends § 23–1501(3)(b) authorizes and supports her claim against GCCC for wrongful termination in violation of ACRA's public policy, even though she could not bring a direct ACRA action against GCCC. Her multiple arguments for that proposition are unpersuasive.

¶ 9 Based on the second and next to the last sentences of subparagraph (3)(b), Taylor concedes that if another "source" statute such as ACRA provides a remedy to an employee/claimant, "an action under that other statute is the exclusive remedy for a violation of the statute—or its public policy," and "the terms of the other statute control in such a non-EPA action." According to Taylor, however, the "residual provision" in the last sentence of subparagraph (3)(b) created a new EPA cause of action, whereby an employee who "otherwise lack[s] a remedy" under another "source" statute "can bring a wrongful termination action under EPA based on the violation of the public policy reflected by [that] other statute." Taylor further asserts that in that scenario, when the other statute affords no remedy to a particular employee/claimant, any "definitions and restrictions contained in the [other] statute" do not apply to that claimant's action under the EPA. § 23–1501(3)(b).

■ ¶ 10 "In interpreting statutes, we attempt to ascertain and give effect to the legislature's intent." *Johnson*, 196 Ariz. 597, ¶ 4, 2 P.3d 687, ¶ 4. "We focus first on the statutory wording and, if it is ambiguous or inconclusive, we consider the statute's 'con-

text, subject matter, historical background, effects, consequences, spirit, and purpose." ' *Bothell,* 192 Ariz. 313, ¶ 17, 965 P.2d 47, ¶ 17, *quoting Mail Boxes, etc. v. Industrial Comm'n,* 181 Ariz. 119, 122, 888 P.2d 777, 780 (1995).

■ ¶ 11 The plain, unambiguous language of the statute defeats Taylor's argument. Viewed as a whole and applied as written, § 23–1501(3)(b) neither authorizes nor supports Taylor's wrongful termination claim. The EPA "limit[s] plaintiffs to three avenues of relief for claims asserted against employers on the theory of wrongful discharge," one of which is when "the discharge violated a statute of this state." *Cronin v. Sheldon,* 195 Ariz. 531, ¶ 17, 991 P.2d 231, ¶ 17 (1999). The only "source" statute underlying Taylor's wrongful termination claim is ACRA. Because GCCC did not "terminate[ ] the employment relationship of [Taylor] in violation of [that] statute," § 23–1501(3)(b), Taylor's reliance on ACRA as the sole basis for her EPA wrongful discharge claim is misplaced.

¶ 12 But even if the first sentence of § 23–1501(3)(b) does not preclude that claim, the balance of the subparagraph does. The so-called "residual provision" in the last sentence of subparagraph (3)(b), on which Taylor relies, authorizes "a tort claim for wrongful termination in violation of the public policy set forth in [another] statute" only if that other statute "does not provide a remedy to an employee for the violation of the [other] statute." § 23–1501(3)(b). ACRA, however, *does* provide a remedy for its violation. In other words, if an employer violates ACRA, that statute provides a remedy to an employee for the violation. As noted above, GCCC is not subject to and, therefore, did not violate ACRA. The EPA does not provide a back door method of suing GCCC in tort for wrongful termination in violation of ACRA or its public policy.[1]

¶ 13 Moreover, § 23–1501(3)(b) provides that "[a]ll definitions and restrictions contained in the [other] statute *also* apply to *any* civil action based on a violation of the public policy arising out of the statute." (Emphasis added.) Taylor's wrongful termination claim is a "civil action." Thus, ACRA's definitions of "[e]mployee" and "[e]mployer" in A.R.S. § 41–1461(1) and (2) apply to this action. Accordingly, we agree with GCCC that the EPA bars Taylor's wrongful termination claim "based on the public policy of the ACRA for the same reason that her claim under the ACRA itself is barred."

¶ 14 That ACRA affords Taylor herself no remedy because of the number of employees GCCC had does not alter that conclusion. In support of her argument that the EPA authorizes her wrongful termination claim because she is personally without recourse under ACRA, Taylor points to the phrase "to an employee" in the second and last sentences of subparagraph (3)(b). But she overlooks language in those same sentences that requires a "violation" of the other "source" statute. As noted above, no such violation occurred here because ACRA did not cover GCCC.

■ ¶ 15 In addition, even if subparagraph (3)(b) were unclear or ambiguous, Taylor's interpretation undermines the legislature's obvious intent and disregards the statute's context, historical background, and purpose. The preamble to the EPA states: "If a statute provides an express remedy *for a cause of action,* that remedy is the exclusive remedy for the violation of the statute or the public policy arising out of the statute." 1996 Ariz. Sess. Laws, ch. 140, § 1(G) (emphasis added). Thus, the legislature clearly did not intend for the EPA to authorize a wrongful termination action based on violation of another statute's public policy when that statute "provides an express remedy for a cause of action," even if such remedy is unavailable to a particular employee/claimant

---

1. *See* Thomas D. Arn, *The Arizona Legislature Enacts Legislation Protecting Employment At-Will,* 33 Ariz. Att'y 40, 43 (Aug./Sept.1996) (The EPA "rectifies the practice whereby claimants have relied on the ACRA as the basis of their wrongful termination in violation of public policy claim but did so free of the limitations otherwise imposed by the Legislature. The [EPA] thus prevents employees from bootstrapping themselves into a cause of action notwithstanding the contrary intentions of the Legislature.").

due to the employer's size or otherwise. *See* David F. Gomez, *The Employment Protection Act After Cronin v. Sheldon*, 36 Ariz. Att'y 28, 28 (Mar.2000) (when EPA claim is based on employer's violation of another statute's public policy, if other statute contains remedy, it is exclusive; and claim is actionable as a tort only if other statute has no remedy, in which case other statute's definitions and restrictions "strictly apply to the asserted claim").

¶ 16 Of course, our supreme court concluded that the EPA preamble is "devoid of operative effect" and "patently unconstitutional." *Cronin*, 195 Ariz. 531, ¶¶ 30, 32, 991 P.2d 231, ¶¶ 30, 32. Nonetheless, we consider the preamble as a reflection "of the legislature's intent in enacting the substantive law." *Johnson*, 196 Ariz. 597, ¶ 4 n. 2, 2 P.3d 687, ¶ 4 n. 2. Adopting Taylor's argument not only would defeat the legislature's intent but also would permit employees of small employers, unlike ACRA claimants, to recover unlimited tort damages and to avoid ACRA's more onerous procedural requirements. *See* A.R.S. § 41–1481(A), (G), (J). Neither the EPA nor common sense supports that result. Accordingly, we agree with GCCC that "[o]nly in th[o]se cases in which a statute does not provide any remedy, but in which there is a violation of the statute, do the public policy provisions of the EPA apply."[2]

¶ 17· Taylor also contends the trial court's ruling "run[s] afoul of *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 710 P.2d 1025 (1985)." As Taylor points out, *Wagenseller* recognized a cause of action for wrongful termination in violation of the public policy underlying Arizona's indecent exposure statute, A.R.S. § 13–1402, "even if there would have been no technical violation of the statute" in that particular case. 147 Ariz. at 380 n. 5, 710 P.2d at 1035 n. 5. The EPA implicates "neither the rationale nor the holding in *Wagenseller.*" *Cronin*, 195 Ariz. 531, ¶ 19, 991 P.2d 231, ¶ 19. Thus, Taylor argues, her wrongful termination claim is actionable under the EPA because "[t]he public policy that is embodied in or arises out of a statute extends beyond the technical definitions and restrictions in the statute."

¶ 18 Taylor's argument misses the mark. First, we have some difficulty with her analysis because the employer's potential tort liability in *Wagenseller* was not based on its violation of the indecent exposure statute, a criminal statute, or that statute's policy, but rather on its having terminated the plaintiff allegedly because she had refused to participate in conduct that, at a minimum, would have violated the public policy underlying the statute. *See Lloyd v. AMF Bowling Centers, Inc.*, 195 Ariz. 144, ¶ 16, 985 P.2d 629, ¶ 16 (App.1999) (*Wagenseller*'s "narrow public policy exception to the termination of at will employment ... requires that the employee be fired for ... refusing to commit a wrongful act.").

¶ 19 In any event, *Wagenseller* illustrates a circumstance not only in which § 23–1501(3)(c)(i) presumably would apply,[3] but also in which the "residual clause" of subparagraph (3)(b) would apply. As the court noted in *Cronin*, "[t]he public policy on which *Wagenseller* was predicated stemmed not from ACRA but from the ... indecent exposure [statute]," which "prescribes no separate civil remedy, thus placing *Wagenseller*-type claims within the permissive scope of the [EPA]." 195 Ariz. 531, ¶ 19, 991 P.2d 231, ¶ 19. Thus, because the indecent exposure statute "does not provide a remedy to an employee for [a] violation of the statute," the employee could "bring a tort claim for wrongful termination in violation of the public policy set forth in the statute." § 23–1501(3)(b).

2. *See* Michael D. Moberly, *Cranking the Wrongful Discharge Ratchet: Judicial Abrogation of Legislative Limitations on the Public Policy Exception,* 24 Seton Hall Legis. J. 43, 97 (1999) (The EPA "limited wrongful discharge claims to situations in which an employment termination was retaliatory or in violation of a public policy expressed in a state statute that contains no remedy of its own.").

3. Under subparagraph (3)(c)(i), an employee has a claim against an employer for termination of employment if the employer has terminated the employment relationship in retaliation for the employee's "refusal ... to commit an act or omission" that would violate Arizona's Constitution or statutes.

¶ 20 ACRA, in contrast, contains definitions that govern its scope and application and also prescribes express, limited remedies for employees who bring actions for violations of that statute. Those same "definitions and restrictions ... also apply to [this] civil action based on a violation of [ACRA's] public policy" and, therefore, preclude Taylor's wrongful termination claim. § 23–1501(3)(b). That conclusion neither undermines *Wagenseller* nor "renders the residual provision entirely superfluous and without effect," as Taylor argues.

¶ 21 In her effort to avoid the ACRA definitions of "employee" and "employer," § 41–1461(1), (2), Taylor also points to that statute's prefatory caveat, "unless the context otherwise requires." § 41–1461. She contends the context here "requires an expansive definition of employer" because the EPA "applies to all employers" and "makes [them] liable for violations of public policy." Whatever else the caveat in § 41–1461 might mean, it does not permit Taylor to circumvent ACRA's specific "definitions and restrictions" when the EPA expressly states they shall "apply to any civil action based on a violation of the public policy arising out of [ACRA]." § 23–1501(3)(b).

¶ 22 Relying on *Broomfield v. Lundell*, 159 Ariz. 349, 767 P.2d 697 (App.1988), Taylor further argues that, although "ACRA itself only imposes liability on some employers for such violations of public policy[,] ... EPA extends that liability to the remainder of employers who terminate an employee in violation of ACRA's public policy." In *Broomfield*, Division One of this court held that ACRA "does not preempt a tort action for wrongful discharge." *Id.* at 357, 767 P.2d at 705. *See also Cronin*, 195 Ariz. 531, ¶ 20, 991 P.2d 231, ¶ 20. But the EPA changed that. As our supreme court noted in *Cronin:*

The legislature has now filled the void identified by *Broomfield* with the exclusive remedies provision of the EPA which

states, in the simplest terms, that since ACRA provides its own remedy for wrongful termination, such remedy becomes the exclusive remedy for an ACRA violation. As a consequence, *Broomfield* is no longer controlling authority because it has been mooted by the legislature, virtually at the invitation of the authoring court.

*Id.* at ¶ 22, 991 P.2d 231.

¶ 23 Finally, from a public policy standpoint, Taylor contends the law cannot permit a situation in which "employees who work for an employer with 14 or fewer employees may be openly and boldly terminated on the basis of race, religion, age, gender, etc. without any remedy whatsoever under either ACRA or the EPA." We do not necessarily disagree with the ideal Taylor postulates. Her argument, however, disregards our supreme court's holdings in *Cronin* that "tort claims alleging wrongful termination in violation of the public policy set forth in ACRA are subject to legislative restriction and may be constitutionally limited to the exclusive remedies set forth in the statute" and that a cause of action for "wrongful termination in violation of public policy expressed in ACRA ... originates exclusively within the statute." 195 Ariz. 531, ¶¶ 15, 39, 991 P.2d 231, ¶¶ 15, 39.

¶ 24 Similarly, the court in *Cronin* also stated: "[A] tort claim alleging wrongful discharge in violation of the ACRA-based public policy is strictly statutory .... The common law gave no protection to employees or others against discrimination based on race, age, or gender and recognized no such right." [4] *Id.* at ¶ 37, 991 P.2d 231. In view of the pronouncements in *Cronin* and the clear legislative intent underlying § 23–1501(3)(b), we find no support for Taylor's assertions that "[t]he legislature clearly intended to give all employees one remedy for a termination that violates public policy—if not under the statute then under EPA," and that the EPA implicitly "provides an alternative remedy as

4. *But see Gesina v. General Elec. Co.*, 162 Ariz. 35, 38, 780 P.2d 1376, 1379 (App.1989) ("An employee's right not to be discharged on the basis of age is a common law right based upon public policy and is independent of any rights accruing under either state or federal civil rights statutes."). In support of that statement, this

court in *Gesina* cited *Bernstein v. Aetna Life & Cas.*, 843 F.2d 359 (9th Cir.1988), which held that ACRA did not preempt a common law wrongful discharge claim premised on the public policy expressed in ACRA. The EPA, however, "effectively overruled *Bernstein* and *Broomfield.*" *Moberly, supra,* at 97.

to each type of statute when its public policy implications are violated by a termination."

¶ 25 Indeed, we glean a totally opposite legislative intent from the EPA's wording, context, and historical background.[5] Those factors clearly reveal that the EPA's primary purpose was to circumscribe, not broaden, wrongful termination claims based on alleged violations of public policy. We note, for example, that when the legislature enacted the EPA in 1996, it also amended ACRA by subjecting small employers with fewer than fifteen employees to sexual harassment claims filed under ACRA. § 41–1461(2); 1996 Ariz. Sess. Laws, ch. 140, § 4. That amendment reflects that, as a matter of public policy, the legislature intended to relax the employer size requirement for some claimants but not others.

¶ 26 In enacting the EPA, the legislature expressly determined and declared the "public policy" in this particular area of the law. § 23–1501. *See* 1996 Ariz. Sess. Laws, ch. 140, § 1(A), (C), (E); *Hart v. Seven Resorts, Inc.*, 190 Ariz. 272, 276 n. 7, 947 P.2d 846, 850 n. 7 (App.1997), *review dismissed*, 191 Ariz. 297, 955 P.2d 534 (1998) (By enacting the EPA, the legislature "defin[ed] the public policy of this state and limit[ed] the situations in which an employee may bring a wrongful termination suit."). *See also Farmers Ins. Co. v. Young*, 195 Ariz. 22, ¶ 12, 985 P.2d 507, ¶ 12 (App.1998) ("The legislature enunciate[s] the public policy by its enactment" of statutes that cover the subject.). Exposing small employers with fewer than fifteen employees to liability for alleged discrimination contravenes the public policy articulated in ACRA. Nothing in the EPA leads

us to conclude that the legislature intended to alter that public policy.

¶ 27 Public policy considerations often come into play in the development and evolution of the common law. *See Cronin*, 195 Ariz. 531, ¶ 27, 991 P.2d 231, ¶ 27; *Wagenseller*, 147 Ariz. at 376–81, 710 P.2d at 1031–36; *Law v. Superior Court*, 157 Ariz. 147, 155–56, 755 P.2d 1135, 1143–44 (1988); *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200 (1983). But when, as here, the legislature has clearly spoken on a matter within its domain, its word constitutes public policy on that subject and controls, assuming no constitutional impediments exist. *See Ray v. Tucson Medical Center*, 72 Ariz. 22, 35, 230 P.2d 220, 229 (1951) ("The declaration of 'public policy' is primarily a legislative function."); *Harrison v. Laveen*, 67 Ariz. 337, 344, 196 P.2d 456, 460 (1948) ("[T]he matter of determining what is 'good public policy' is for the executive and legislative departments and ... the courts must base their decisions on the law as it appears in the constitution and statutes.").

¶ 28 Although one might question the wisdom of some of the legislative determinations that underlie the EPA, we cannot second-guess or overturn what appear to be clear, deliberate legislative choices. *See* Michael D. Moberly, *Cranking the Wrongful Discharge Ratchet: Judicial Abrogation of Legislative Limitations on the Public Policy Exception*, 24 Seton Hall Legis. J. 43, 99, 101, 104–05 (1999). Accordingly, the trial court did not err in entering summary judgment in favor of GCCC on Taylor's tort claim for wrongful termination.

---

5. *See* Jenny Clevenger, Comment, *Arizona's Employment Protection Act: Drawing a Line in the Sand Between the Court and the Legislature*, 29 Ariz. St. L.J. 605, 615 (1997) (The EPA provides no remedy to alleged victims of discrimination employed by small business); Marzetta Jones, Note, *The 1996 Arizona Employment Protection Act: A Return to the Employment–At–Will Doctrine*, 39 Ariz. L.Rev. 1139, 1141, 1154, 1157, 1159 (1997) (to same effect); Jacqueline M. Dunckley, *The Constitutionality of the Employment Protection Act*, 34 Ariz. Att'y 28, 29–30, 34 (Mar.1998) (The EPA bars suit by employees of small employers based on alleged violation of ACRA public policy); David F. Gomez, *The Em-*

*ployment Protection Act After Cronin v. Sheldon*, 36 Ariz. Att'y 28, 30 (Mar.2000) ("Under the EPA, employees of small businesses can neither invoke ACRA[']s or federal statutory protection (with the sole exception of ACRA's protection against sexual harassment), nor bring a common law *Broomfield* tort claim."); David F. Gomez, *The 1996 Employment Protection Act and the Abolition of Common Law Wrongful Termination in Arizona*, 33 Ariz. Att'y 36, 36, 39 n. 6 (Aug./Sept. 1996) (noting that employees of small business who had "long relied on the common law as their only protection against or remedy for wrongful termination" were "hardest hit" by the EPA).

**192**

## II. Breach of Contract Claim

¶ 29 Taylor next challenges the trial court's entry of summary judgment on her claim for breach of contract. We review de novo that ruling and any issues concerning contract interpretation. *Johnson,* 196 Ariz. 597, ¶ 2, 2 P.3d 687, ¶ 2; *Bothell,* 192 Ariz. 313, ¶ 8, 965 P.2d 47, ¶ 8. Taylor bases her contract claim primarily on various provisions in GCCC's personnel manual, the first page of which stated: "This handbook does not constitute an expressed or implied employment contract, but rather is intended to provide only guidelines as to [GCCC's] general rules and policies." The manual specified the GCCC board of directors as "the policy making body" and further provided in pertinent part:

*Equal Employment Opportunity.* It is the policy of [GCCC] to grant equal opportunity to all qualified persons without regard to race, color, age, sex, religion, or national origin. To deny one's contribution to our efforts for any reason other than his/her capability of performing the job is an injustice not only to the individual, but to [GCCC] and [the] community as well. It is the intent and desire of [GCCC] that equal opportunity be provided in employment, wages, promotion, benefits and all other privileges, terms and conditions of employment.

. . . .

*Trial Period.* Employees are hired on a 90 day trial period during which the new staff member may evaluate his/her position and [GCCC] may evaluate the ability and attitude of the new employee. At the end of the trial period, a written evaluation will be made of the employee's attitude, ability and capacity to determine whether the employee shall become a regular employee.

*Dismissal.* Employees will be dismissed by the Executive Director, with the approval of the Board, if their work is not proven satisfactory; for repeated absence from work, negligence of assigned duties, any type of substance abuse; or for other special reasons.

*Resignation.* . . . [GCCC] recognizes that an employee has the right to terminate his/her employment at will, whenever they choose, for any reason, or no reason. [GCCC] reserves to itself the same right with respect to termination of employment.

The last page of the thirteen-page manual contained the following employee acknowledgment, beneath which were lines for the date and employee's signature:

I have received a copy of the employee handbook and have read it carefully. I understand all of its rules and policies and agree to abide by them. I understand and agree that any provision of this handbook may be amended or revised at any time by [GCCC]. I also understand and agree that my employment is terminable at will so that both [GCCC] and I remain free to choose to end our work relationship at any time, and further, that nothing in this handbook in any way creates an express or implied contract of employment between [GCCC] and me.

¶ 30 The record neither includes a signed copy of that acknowledgment page nor does it otherwise reflect whether Taylor ever signed the acknowledgment or even received or read the manual. In an affidavit, however, Taylor stated that she "never [had been] required to sign or acknowledge any disclaimers concerning [her] employment with [GCCC]." And, she expressed various beliefs based on the manual; therefore, she presumably reviewed it at some point in time.

¶ 31 Before the EPA was adopted, Arizona law was clear that all employment relationships, including at-will relationships, were contractual in nature. *Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038. *See also Wagner v. City of Globe,* 150 Ariz. 82, 85, 722 P.2d 250, 253 (1986). In addition, under pre-EPA common law, employment relationships for an indefinite term were presumed to be terminable at will. *Id.* at 84, 722 P.2d at 252. *See also Lloyd,* 195 Ariz. 144, ¶ 9, 985 P.2d 629, ¶ 9. The EPA retains those concepts by declaring that "[t]he employment relationship is contractual in nature" and that "[t]he employment relationship is severable at the pleasure of either the employee or the employer," subject to the specified, statutory exceptions set forth in paragraph (2). § 23–1501(1), (2).

¶ 32 Thus, the EPA authorizes a contract claim for termination of employment only if "[t]he employer has terminated the employment relationship of an employee in breach of an employment contract, as set forth in paragraph 2 of [§ 23–1501]." § 23–1501(3)(a). Paragraph (2), in turn, provides in pertinent part:

> The employment relationship is severable at the pleasure of either the employee or the employer unless both the employee and the employer have signed a written contract to the contrary setting forth that the employment relationship shall remain in effect for a specified duration of time or otherwise expressly restricting the right of either party to terminate the employment relationship. Both the employee and the employer must sign this written contract, or this written contract must be set forth in the employment handbook or manual or any similar document distributed to the employee, if that document expresses the intent that it is a contract of employment, or this written contract must be set forth in a writing signed by the party to be charged.

§ 23–1501(2). Therefore, in order to maintain an actionable breach of contract claim under the EPA and to avoid at-will employment status, an employee must establish one of the exceptions set forth in paragraph (2).

¶ 33 Section 23–1501(2) is not a model of clarity. Its general rule, that "[t]he employment relationship is severable at the pleasure of either the employee or the employer," that is, at will, is easy enough to understand. But the following exceptions to that general rule do not make for easy reading.

¶ 34 The first exception arises if "both the employee and the employer have signed a written contract to the contrary setting forth that the employment relationship shall remain in effect for a specified duration of time." § 23–1501(2). No such contract exists in this case, nor does Taylor so allege. The second exception also requires "a written contract," signed by "both the employee and the employer," that "otherwise expressly restrict[s] the right of either party to terminate the employment relationship." *Id.* In the absence of a signed written contract, Taylor cannot establish that exception.

¶ 35 For some reason § 23–1501(2) then reiterates that "[b]oth the employee and the employer must sign this written contract," presumably referring to the "signed ... written contract" referred to in the immediately preceding sentence. But to complicate matters, the second sentence continues, "or *this written contract* must be set forth in the employment handbook or manual or any similar document distributed to the employee, if that document expresses the intent that it is a contract of employment." *Id.* (emphasis added). Arguably the phrase "this written contract" again refers to the first sentence of paragraph (2), which requires a written contract signed by both parties. Because the second sentence is worded in the disjunctive, however, the legislature apparently did not intend to require a signed written contract when an employment handbook or manual distributed to the employee "expresses the intent that it is a contract of employment." *Id.* But even if the signature requirement does not apply to employment handbooks or manuals, any written contract based thereon must either set forth "a specified duration of time" or "expressly restrict[ ] the right of either party to terminate the employment relationship," as required by the first sentence of paragraph (2). *Id.*

¶ 36 Before the EPA was enacted, our supreme court recognized exceptions to the at-will presumption based not only on public policy grounds but also on theories of "implied-in-fact" contracts and the "implied covenant of good faith and fair dealing." *See Wagenseller,* 147 Ariz. at 381, 385, 710 P.2d at 1036, 1040; *see also Wagner,* 150 Ariz. at 85, 722 P.2d at 253; *Leikvold v. Valley View Community Hosp.,* 141 Ariz. 544, 545–46 n. 1, 688 P.2d 170, 171–72 n. 1 (1984). But the plain wording and legislative intent of § 23–1501 have changed the legal landscape. The EPA not only maintains the at-will presumption but also specifies the limited exceptions to that general rule. § 23–1501(2).

¶ 37 As we stated in *Johnson:* "The legislature's stated intent in enacting § 23–1501 was to limit the circumstances in which a terminated employee can sue an

employer to those situations involving either qualifying written contracts or an employer violating the public policy of the state as enunciated in the state constitution and statutes." 196 Ariz. 597, ¶ 4, 2 P.3d 687, ¶ 4 (citations omitted). The EPA, therefore, circumscribes when an employee can avoid the at-will presumption and places the burden squarely on the employee to prove his or her employment relationship is not severable at will because it falls within one of the statutorily limited circumstances. *See* Rita A. Meiser, *DeMasse v. ITT Corporation: A New Legal Landscape for Employee Handbooks?*, 36 Ariz. Att'y 22, 23 (Mar.2000) (The EPA "shifted the burden from the employer to the employee to demonstrate that a modification to the at-will relationship exists.").

■ ¶ 38 Thus, the issue is whether GCCC's personnel manual on which Taylor relies "expresses the intent that it is a contract of employment" *and* "expressly restrict[s] the right of either party to terminate the employment relationship." [6] We begin with the presumption that ·Taylor's employment with GCCC was terminable at will. *See* ¶ 31, *supra*. Even assuming the personnel manual was "distributed" to Taylor, *see* ¶ 30, *supra*, it does not satisfy the other statutory prerequisites for avoiding that presumption and maintaining a viable action for breach of contract under the EPA. § 23–1501(2).

¶ 39 To support a different conclusion, Taylor relies primarily on the provisions in the personnel manual labeled "Equal Employment Opportunity," "Trial Period," and "Dismissal." *See* ¶ 29, *supra*. Taylor contends those provisions cumulatively reasonably could have led a non-probationary GCCC employee, and in fact led her, to believe that GCCC could only terminate her with board approval and for one of the specific reasons set forth in the manual's "Dismissal" section. The argument has several flaws.

¶ 40 First, and most importantly, Taylor failed to establish that the personnel manual "expresse[d] the intent that it is a contract of employment." § 23–1501(2). Indeed, clear, unambiguous statements on the first and last

pages of the manual establish just the opposite. In view of those statements—the manual "does not constitute an expressed or implied employment contract" and "nothing in this handbook in any way creates an express or implied contract of employment"—the manual clearly negates rather than "expresses" any "intent that it is a contract of employment."

¶ 41 Second, based on the manual's clear language, no employee could reasonably believe that the employment relationship was anything but severable at the will of either party. GCCC specifically "reserve[d] to itself" the right "to terminate [an employee's] employment at will, whenever [it] [chose], for any reason, or no reason." The · manual's acknowledgment page similarly confirmed that employment was "terminable at will" and that GCCC "remain[ed] free to choose to end [a] work relationship at any time." Thus, rather than "expressly restricting the right of either party to terminate the employment relationship," § 23–1501(2), the manual clearly confirmed the at-will status of all employees.

■ ¶ 42 Third, aside from Taylor's failure to satisfy the statutory prerequisites of § 23–1501(2), the personnel manual provisions on which she relies are not reasonably susceptible to her proffered interpretation—that GCCC "regular" employees could only be terminated "for cause" and with prior board approval. The manual did not require prior approval of GCCC's board in order to terminate an employee; and it is undisputed that the board ultimately approved Taylor's termination, albeit after the fact. Similarly, the manual's list of various reasons for which employees automatically "will be dismissed" was neither exhaustive nor exclusive. And, although the manual refers to "a 90 day trial period," after the successful completion of which "the employee shall become a regular employee," the manual neither defines nor sets forth any rights or obligations of a "regular employee." Miller testified that the difference between a probationary and "regular" employee pertained to a determination

---

**6.** The record does not reflect any "written contract ... in a writing signed by [GCCC,] the party to be charged," nor does Taylor contend any such contract existed. § 23–1501(2).

of the latter's appropriate wage and eligibility for benefits. In any event, a provision that differentiates "probationary" from "regular" employees is not, in and of itself, sufficient to rebut the presumption of at-will employment. *See Beales v. Hillhaven, Inc.*, 108 Nev. 96, 825 P.2d 212, 216 (1992).

¶ 43 Regardless of her at-will status, Taylor further contends she has an actionable common law claim for breach of contract independent of the EPA.[7] We disagree. *See Johnson*, 196 Ariz. 597, ¶ 3, 2 P.3d 687, ¶ 3 (plaintiff's argument that his contract "was enforceable under common law" was "irrelevant in light of § 23–1501, which specifically curtails most causes of action for termination of employment"). *See also Cronin*, 195 Ariz. 531, ¶ 17, 991 P.2d 231, ¶ 17. As we noted in *Johnson*, the EPA "changes our inquiry from whether the employment agreement is enforceable at common law to whether the employment agreement satisfies the statutory requirements." 196 Ariz. 597, ¶ 4, 2 P.3d 687, ¶ 4.[8]

¶ 44 This court stated in *Johnson:* "In determining whether an employment agreement satisfies the requirements of § 23–1501, we apply common law principles of contract interpretation and attempt to determine and give effect to the parties' intent." *Id.* at ¶ 5, 2 P.3d 687, *citing Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). Unlike this case, however, *Johnson* did not present or address any issue as to whether a written employment contract existed between the parties. Rather, the issue in *Johnson* was whether the contract reasonably could be interpreted to mean the employee had been promised employment for a definite term. In contrast, as noted above, GCCC's personnel manual neither "expresses the intent that it is a contract of employment" nor "expressly restrict[s] the right of either party to terminate the employment relationship." § 23–1501(2). Because Taylor failed to establish both of those statutory requirements, her contract claim fails.[9]

¶ 45 Taylor's subjective beliefs that her "regular employee status meant that [she] could not be terminated by [GCCC] except for the reasons stated in the personnel manual" and "could only be terminated in accordance with the procedures set forth" in that manual, do not alter that conclusion. *See Beales*, 825 P.2d at 216 (employee's "subjective expectation of long term employment does not alter her at will status"). Nor does the deposition testimony of the former GCCC

---

7. In support of that proposition, Taylor refers to the legislature's 1996 amendment to A.R.S. § 12–541(3), which imposed a one-year statute of limitations on actions "[f]or breach of an oral or written employment contract," suggesting oral contracts are enforceable despite § 23–1501(2). 1996 Ariz. Sess. Laws, ch. 140, § 2. But Taylor neither alleged nor established that she had an enforceable oral contract with GCCC; and this case presents no statute of limitations issue. In any event, the amendment to § 12–541(3) does not breathe life into a claim for breach of an alleged written employment contract that fails to satisfy the EPA requirements in § 23–1501(2).

8. Commentators also have rejected Taylor's assertion. *See* Clevenger, *supra*, at 612 (Under the EPA, "[a] contract of employment must be in writing and signed by both parties," and "[t]he provisions of an employment handbook or manual are contractual only if expressly stated therein."); Jones, *supra*, at 1150–51 (to same effect); Arn, *supra*, at 42 (The EPA "eliminates the onerous totality of the circumstances factual inquiry imposed by the implied-in-fact exception in favor of a clear writing requirement."); Dunckley, *supra*, at 33 ("[A] common law claim for breach of an implied employment contract is no longer available .... With respect to the current status of the implied-in-fact alteration to the employ-

ment contract in light of the Act, this cause of action no longer exists."); Gomez, *The Employment Protection Act After Cronin v. Sheldon*, *supra*, at 28 (The EPA "abolished all implied contract claims based on employer representations, custom, practice, or a course of conduct."); Gomez, *The 1996 Employment Protection Act*, *supra*, at 39 (The EPA "abolished common law claims for breach of implied contract in the employment setting recognized in *Wagenseller, Leikvold ...*, and *Loffa v. Intel Corp.*," 153 Ariz. 539, 738 P.2d 1146 (App.1987)); Meiser, *supra*, at 23 (the EPA "limited the implied-in-fact contract recognized" in *Wagenseller;* a breach of contract claim now lies only when "an employment contract exists, and the contract meets the rigid criteria of the statute").

9. We also note that even under pre-EPA common law, GCCC's manual "clearly and conspicuously [told its] employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason." *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174. *See also Wagenseller*, 147 Ariz. at 382, 710 P.2d at 1037; *Hart*, 190 Ariz. at 278, 947 P.2d at 852.

board president, Taylor's former co-employee, or Miller as to their perceived need for a legitimate reason for firing an employee. Such parol evidence is not admissible to supply a missing term or to vary or contradict the manual's clear, express provisions. *See Johnson,* 196 Ariz. 597, ¶ 5, 2 P.3d 687, ¶ 5 ("If the employment agreement is reasonably susceptible of the interpretation [plaintiff] suggests, extrinsic evidence is admissible to interpret its terms, but not to supply a required element.") (citations omitted). *See also Taylor,* 175 Ariz. at 155, 854 P.2d at 1141 (parol evidence inadmissible when contract language "not reasonably susceptible to the asserted meaning"). But even if the evidence were admissible, those witnesses' views as to what fairness and good business practice may require do not transform the personnel manual into an enforceable employment contract that satisfies the EPA's requirements.

¶ 46 Finally, Taylor's reliance on *Demasse v. ITT Corp.,* 194 Ariz. 500, 984 P.2d 1138 (1999), is misplaced. That case neither involved nor addressed the EPA. In addition, the court in *Demasse* answered certified questions from the Ninth Circuit Court of Appeals on the "premise that a contract exists," *id.* at ¶ 11, 984 P.2d 1138, and that the layoff seniority provision at issue had "become part of the employment contract." *Id.* at ¶ 3, 984 P.2d 1138. In any event, the provisions in GCCC's personnel manual on which Taylor relies were " 'neither a promise nor a statement that could reasonably be relied upon as a commitment." ' *Id.* at ¶ 15, 984 P.2d 1138, *quoting Soderlun v. Public Serv. Co.,* 944 P.2d 616, 620 (Colo.App.1997). The trial court did not err in entering summary judgment in favor of GCCC on Taylor's contract claim.

### DISPOSITION

¶ 47 The trial court's summary judgment in favor of GCCC is affirmed. In our discretion, we deny GCCC's request for attorneys' fees on appeal.

FLÓREZ and HOWARD, JJ., concur.